375 F.2d 265
 Deane M. CORBETT, Administrator of the Estate of Philip
Kripitzer, Deceased,
v.
Joseph BORANDI, Individually and trading as Joseph Borandi
Garage (Defendant and Third-Party Plaintiff), Appellant, v.
James FREEMAN and Sears, Roebuck& Company, a Corporation
(Third-Party Defendants).
 No. 15934.
 United States Court of Appeals Third Circuit.
 Argued Jan. 17, 1967.
Decided March 22, 1967.
 
 Lisle A. Zehner, Pittsburgh, Pa., for appellant.
 James P. Gill, Pittsburgh, Pa. (Edward O. Spotts, Spotts, Gill, Gavin & Morrow, Voss & Voss, Pittsuburgh, Pa., on the brief), for appellee Freeman.
 Randall J. McConnell, Jr., Pittsburgh, Pa. (Dickie, McCamey & Chilcote, Pittsburgh, Pa., on the brief), for appellee Sears, Roebuck & Co.
 Before HASTIE, GANEY and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 GANEY, Circuit Judge.
 
 
 1
 The appellant is here appealing from that portion of an order entering judgment in favor of the plaintiff and against the defendant, Borandi.
 
 
 2
 This was an action by Deane M. Corbett, administrator of the estate of Philip Kripitzer, against Joseph Borandi, individually, and trading as Joseph Borandi Garage. In turn, Joseph Borandi brought on the record James Freeman and Sears, Roebuck & Company, a corporation, as third-party defendants.
 
 
 3
 The subject matter of the suit concerns itself with an action under the Pennsylvania Wrongful Death[1] and Survival[2] Statutes to recover damages for the death of the decedent, Philip Kripitzer, who was struck by an automobile owned and operated by James Freeman, one of the third-party defendant, under the following circumstances.
 
 
 4
 On January 28, 1964, the third-party defendant, James Freeman, brought his automobile, a 1958 Cadillac sedan, to the Borandi Texaco station in order to have the car inspected, to which place he also had taken the car for inspection previously. Freeman pulled his car in on the floor and asked the mechanic to check the accelerator by reason of the fact that it had stuck the day before when his wife was using the car. He testified that the mechanic nodded his head when he told him to check the accelerator. During the progress of his work he stopped and another mechanic, Ehrlich, came in and completed the examination of the car. Freeman gave him his ownership card and when he asked for the sticker he was told to go to Verona Boulevard to get it and when he questioned this manner of proceeding, he was told that this was the procedure. At no time during the examination was the car road tested as it never left the gasoline station except for the trip to secure the sticker. He drove about four miles and came to the Borandi Garage, drove into the yard in front of the garage, stopped the motor, applied the brakes and put the car in neutral. At this time he was approached by an attendant and was asked 'Are you Freeman?' and when advised that he was, the attendant got into the car and placed the sticker on it. The attendant was later identified as one Edward R. Eyler, Jr. It was getting dark and after the sticker had been placed on the car, he told him 'You are on your way.' Freeman's car was facing Borandi's parking lot and he got into the car and noticed that Eyler was talking with the decedent, Kripitzer, as they were walking along the side of the car. He 'cranked' up the car-- turned on the switch-- and then placed his foot on the accelerator and it went right down to the floorboard which opended the throttle the whole way and the car went at full speed straight ahead striking Kripitzer who had been standing some four or five feet in front of his car. He was carried on the hood, across the road where the car struck another car as it veered to the right and Kripitzer fell off and the car continued across Verona Boulevard through a pile of snow and ran into an enbankment where it stopped. Freeman testified that he put very little pressure on the accelerator when it went right down to the floorboard.
 
 
 5
 It was later disclosed that one Boyle had called Eyler, a clerk at the garage, and told him that Freeman would be there in a short time and that he was to place the sticker on his car which, as indicated above, he so did. He testified that the decedent, Kripitzer, had no chance to get out of the way as the car had started out at such a high speed. He also testified that he was told, as nearly as he could remember, that Joseph Borandi told him the name of the inspector who checked the car was Edward Quinette, who was an inspector employed by Borandi. However, Mr. Quinette testified that he never inspected the car and, as a matter of fact, he never even saw the automobile and, accordingly, knew nothing of the transaction whatsoever.
 
 
 6
 Freeman had testified that after the accident Ehrlich had told him not to mention the accelerator even though Freeman, as has been stated, had earlier advised the mechanic before the inspection that the accelerator had stuck on several occasions before and as late as the day before.
 
 
 7
 One of the requirements of the rules promulagated by the Bureau of Traffic Safety under the direction of the Secretary of Revenue of Pennsylvania provides that a car, before it can be approved as properly inspected, must be road tested.
 
 
 8
 As indicated, the witness, Freeman, testified that he had directed the inspector at the gasoline station to check on the accelerator and that the car was never road tested and this was one of the basic negligent acts alleged on the part of the plaintiff.
 
 
 9
 On behalf of the defendant, one Roeschenthaler was called who testified he was not fully self-employed, but that he was 'working for South Hills Movers as a mechanic and driver there, and I do appraising part time.' Also, that he was an independent contractor doing appraisals and claim adjusting work for insurance companies, including Erie Insurance Company, and was paid on an individual basis for his time. In this instance, he was paid $28 for his investigation and $10 an hour for preparing his report and testifying. He further stated that he checked on the car on January 29, 1964, when he was 'requested to check the Freeman vehicle' at Sandy Creek Garage, known as Young's Garage. He was also instructed to check a stuck accelerator. He obtained a flashlight from the proprietor, Mr. Young, and examined the accelerator pedal, which he could see very well, and he found that if pushed freely to a point 5/8 to 7/8 of the distance to the floor, it would work well and a little further on you could feel it pulling and then it snapped full open and it would leave your foot and just automatically go to the floorboard. On the 29th of January, when he made his first investigation, he could not get the hood up to look inside, as the linkage, that is the latch holding the hood down, was locked due to the accident. However, on the 31st, when he went to make a further examination, he found the hood had been raised and that the air filter was missing. He discovered that the return spring on the accelerator could accelerate normally if the pressure had been applied from 5/8 to 7/8 the way down and then, as indicated, snapped automatically to full throttle. He said this was due to the fact that the return spring was hooked in the wrong position, that is from the rear of the carburetor linkage to the rear or fire wall of the car, when it should have been hooked to the oil filter leg in the front portion of the car. He further testified that with the air filter in place, you could not readily see the return spring, as it would only be visible by taking the air filter off if you really wanted to see it completely. He further testified that it was unnecessary to road test the car and that a station inspection by a competent mechanical inspector would not have revealed the wrong position of the return spring attached to the accelerator, as this was not a part of the requisite inspection which was necessary to secure a sticker. All of this investigation which he did was without the knowledge of defendant, Borandi.
 
 
 10
 Accordingly, the issue is drawn for the jury as to whether the car should have been road tested as testified to by the plaintiff's witnesses and the accelerator checked and the testimony of Roeschenthaler who said it was not necessary to road test the car and with the air filter in place it was not possible to see the return spring, as the air filter had to be removed in order to get at the same and, accordingly, while he admitted the snapping automatically of the accelerator, as indicated above, after it had reached a position 5/8 to 7/8 from the floor, this could not be revealed by inspection. Therefore, Roeschenthaler's credibility was a paramount issue in the case since if he was believed, there would be no liability on the part of Borandi, the defendant. He stated flatly that if the car had been road tested on January 28, 1964, it would not have revealed the defect in the accelerator system since up to 5/8 to 7/8 of the way down the car would travel up to 60-65 miles per hour and since the test was to be conducted in the city of Pittsburgh, the person testing the car would not drive it beyond that speed since it would be in violation of the ordinances of the city of Pittsburgh.
 
 
 11
 Counsel for the plaintiff then asked the following questions:
 
 
 12
 'Q. Who told you to go out and examine this motor?
 
 
 13
 'A. Mr. Bill Kolicius.
 
 
 14
 'The Court: Who does he represent?
 
 
 15
 'The Witness: Erie Insurance Company.
 
 
 16
 'Q. You are being paid by the Erie Insurance Company, are you not? You were being paid and are at this moment being paid by the insurance company, are you not?
 
 
 17
 'A. I was paid then. Now, I assume that I am being paid by Erie.
 
 
 18
 'The Court: Just a minute.
 
 
 19
 Ladies and gentlemen of the jury, in a case of this nature, an insurance company is not a party to the proceedings, and in Pennsylvania, generally speaking, no reference can be made to the fact that a person being sued, or a defendant carries liability insurance. It has no relevancy to the issues, and in your deliberations in this case you shall not consider the fact that this defendant is insured by an insurance company. You shall not even discuss it, because you are to decide this case, regardless of the financial condition of the party, the defendant, regardless of whether he does or does not have insurance, solely on the facts in this case and the law as given you by the court.
 
 
 20
 There are certain rules of law that govern and control your deliberations as to whether this defendant is or is not liable. There are certain rules of law that govern your deliberations as to the amount of damages this plaintiff is capable, or permitted to recover; and again, you shall not in your deliberations discuss for one second the fact that this defendant has insurance. The reason that I am permitting it in this case is as follows.
 
 
 21
 This gentleman, you will find from the evidence, was called by the insurance company to go out and make an investigation the evening this accident happened, or the next day in the early morning. He is not only offering an opinion as to appraising, but he is offering an opinion as an expert in the case, so that he has engaged in a course of activity after he had been employed by the insurance company that goes far beyond the activity of a person who generally acts as an appraiser, and who generally acts an an expert.
 
 
 22
 Now, you have heard testimony in this case of an expert called by the plaintiff who has testified for your consideration that in his professional opinion it was the duty to road test this car, and that if the car had been road tested this condition would have been found, and that is without any consideration of the testimony offered by the plaintiff that the owner of this car had asked the company, or the defendant, to whom he took this car, for an inspection to specifically check the foot accelerator.
 
 
 23
 This gentleman is now contradicting that expert's opinion, and in your deliberations, among other things you are going to have to decide which expert you are going to believe, and that is the reason that I am permitting examination to be made about this witness' connection with the Erie Indemnity Insurance Exchange. They are actively defending this case through their eminent counsel, and therefore they are a party in interest in this, and where a person is interested in a case, the connection of the witness with the person interested becomes of material importance in aiding you in determining the credibility or the believability of the witnesses that you evaluate.
 
 
 24
 So this testimony is permitted for one reason alone: To aid you in determining what believability and credibility you are going to give to this witness, since you will find he was employed by the Erie Indemnity Insurance Exchange the night this accident happened and the next morning, to make an investigation, and that is the sole purpose of this testimony.
 
 
 25
 I note you an exception to that charge.'
 
 
 26
 It was further explained that Roeschenthaler was an expert mechanic who acted as an independent damage appraiser and adjuster for various insurance companies, and defendant contended that, even if the inspection of the Freeman vehicle was negligently performed, it was not the proximate cause of the accident.
 
 
 27
 In a conference, absent the jury, counsel on the defense side stated he was representing the insurance company and that it had a reservation of right clause in its policy, by which it could contest Borandi's right to coverage. This, Borandi stated, he was unaware of.
 
 
 28
 The trial resulted in a verdict for the plaintiff against the defendants, Borandi and Freeman, totaling $137,000 and counsel for the defendant, Borandi, moved for a new trial, which motion was denied. This appeal is taken from the order of the court dated April 18, 1966, denying defendant's motion for a new trial and entering judgment for the plaintiff. As heretofore indicated, in the action over by Borandi in the third-party suit, Freeman was found guilty of negligence and as against Sears, Roebuck & Company, the jury found in its favor. An examination of the notice of appeal contains no reference to Borandi's appealing from the judgment in favor of Sears, roebuck & Co., except by a broad construction of the said order, which might possibly include it therein, and, out of an abundance of caution, Sears, Roebuck & Company appeared at the hearing on appeal and argued their side of the case, although Borandi orally expressed no interest in their appeal and made no argument in connection therewith.
 
 
 29
 The sole question on this appeal, as stated by counsel and as appears in their briefs, involves only the question of whether or not the introduction into evidence and the disclosures during the trial by counsel for the plaintiff, with the approval of the trial court, that the expert witness, Roeschenthaler, was employed by the Erie Insurance Company, was such prejudicial error as to warrant a new trial.
 
 
 30
 During the early part of the trial, the court, at sidebar, instructed counsel he would impose heavy sanctions on them if the word 'insurance' was mentioned in the case. However, as the issue became more patent evoking a question of credibility between plaintiff's witnesses and Roeschenthaler, the defendant's witness, as to whom was to be believed, the court, as indicated, instructed counsel for the plaintiff that he could show Roeschenthaler's employment by the insurance company in order that the jury might properly evaluate his testimony.
 
 
 31
 As a general proposition, it has been repeatedly held, as an instance, that because of the line of argument pursued by counsel in addressing a jury, or because of improper remarks of counsel, alleged prejudice thereof must be determined by the circumstances under which the statements were made, and it is a matter for the trial judge's discretion to weigh the alleged prejudicial remarks and make a determination as to whether they are so prejudicial as to affect the fairness of the trial. McCune v. Leamer, 383 Pa. 434, 437, 119 A.2d 89; Richman v. Watkins, 376 Pa. 510, 521, 103 A.2d 688; Bourd et al. v. Berman, 359 Pa. 183, 58 A.2d 442; Clark v. Essex Wire Corporation, 361 Pa. 60, 63 A.2d 35; Wilhelm v. Uttenweiler, 271 Pa. 451, 112 A. 94. Since the trial judge is in a far better position, by virtue of his familiarity with the atmosphere of the trial, to evaluate the effect of any statement on the jury, he may feel that an admonition to the jury to disregard the remarks is sufficient. Menarde v. Philadelphia Transportation Company,376 Pa. 497, 102 A.2d 681; Donahue v. Punxsutawney Borough, 298 Pa. 777, 148 A. 41. Likewise, generally, where the questions have relevancy merely to test the qualification of the witness, the extent to which such cross-examination can be carried on must, likewise, be within the sound control of the court. Thompson v. American Steel & Wire Co., 317 Pa. 7, 175 A. 541; Haughney v. Gannon, 274 Pa. 443, 118 A. 427; Sebring v. Weaver, 42 Pa.Super. 588; Wigmore, Evidence, sections 944, 991 and 1006. The Supreme Court, in defining prejudice, stated in Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624, though a criminal case, 'Prejudice (to defendant's case) ensues from a denial of the opportunity to place the witness in his proper setting.'
 
 
 32
 The problem here raised concerns itself with what has been a sensitive area in the trial of negligence cases for nearly sixty years. The word 'insurance', in the trial of negligence cases, has been a kind of 'bete noire', something to be avoided by witnesses and the court at the peril of withdrawal of a joror or, later, as a ground for a new trial. The basis for its rigid exclusion is that it really afforded an additional defendant and one that was extremely lucrative, although one that had no relevancy whatsoever to the issue and the case. However, as time went on in a changing economic era, gradually, as we shall see, the legal harshness of the rule began to recede. Thus, exceptions were made where a witness had spoken of 'insurance' not in answer to a direct question and the court corrected the matter by proper instructions to the jury. Later on, as we shall advert to, in its proper context, the Supreme Court of Pennsylvania sanctioned its use. Goodis v. Gimbel Brothers, 420 Pa. 439, 444, 218 A.2d 574.
 
 
 33
 In Hollis v. United States Glass Co., 220 Pa. 49, 69 A. 55, the plaintiff's counsel, in addressing the jury, said: 'It is nothing to the glass company what this verdict should be. It is the insurance company that will pay the verdict. * * * Remember, this company does not pay the verdict.' This case, upon which later Pennsylvania cases were predicated, followed the earlier rulings of the New York and Illinois courts, Manigold v. Black River Traction Co., 81 App.Div. 381, 80 N.Y.S. 861; George A. Fuller Co. v. Darragh, 101 Ill.App. 664, and set the stage for the general rule that in the trial of cases, ordinarily the word 'insurance' should not be used. Brown v. City of Scranton, 231 Pa. 593, 80 A. 113; Curran v. Lorch, 243 Pa. 247, 90 A. 62.
 
 
 34
 In Fleischman v. City of Reading, 388 Pa. 183, 130 A.2d 429, in which instance a visitor, a total stranger, came to see the plaintiff in the hospital and, when asked the question, 'Did you know later who he was?', answered, 'Yes, he left his card on the dresser, and a visitor a day or two later told me a certain man was in to see me because he must have left a card, and I didn't know anything about it. Q. Who was the man that took it? A. An insurance man.' Here, the court pointed out at p. 190, 130 A.2d at p. 433: 'At the end of the cross-examination on the hospital statement, two adversaries faced each other in the arena of disputed probity; on one side Mr. Fleischman and on the other side Mr. Shadow (representing the insurance company). So far as the jury was concerned, Mr. Shadow could even have been someone speaking for the law, someone representing the Court, someone authorized to concuct an impartial interrogation.
 
 
 35
 * * * Candor and fair dealing dictate that when an insurance company undertakes to participate in a trial to the extent that it produces a paper, allegedly signed by the plaintiff, to repudiate the paper, the insurance company should not be allowed to conceal its interest behind a misty curtain of anonymity. An insurance company which is actively defending a lawsuit for damages has as much interest in the outcome of the trial as the plaintiff and cannot claim immunity from rules which are binding on its adversary, the plaintiff.' Later on, the court said (p. 192, 130 A.2d p. 434): 'An insurance company is not sacrosanct. It has an interest in a lawsuit in which it may be called upon to pay all or at least a part of a judgment if against the insured. That such interest may at times cause those who represent it to offend against the proprieties is not without the bounds of reason. It is appropriate and proper that a court should protect it in all of its legal rights but when, and if, a factual situation develops which, if true, establishes an overreaching on the part of its representative in securing information to its advantage, surely opportunity to show this fact will not be denied a party affected.'
 
 
 36
 Later, the court began to permit the showing of relationship on cross-examination for the purpose of testing the witness's credibility. In Kaplan v. Loev, 327 Pa. 465, 469, 194 A. 653, 655, in discussing Lenahan v. Pittston Coal Mining Co., 221 Pa. 626, 629, 70 A. 884, the court stated as follows: 'The opinion goes on to point out that it is always the right of the party against whom a witness is called to show by cross-examination 'that he has an interest direct or collateral in the result of the trial or that he has a relation to the party from which bias would naturally arise.' As the opinion points out, cross-examination is proper only 'as long as it (is) conducted in good faith for a legitimate purpose."
 
 
 37
 Additionally, the court in Deeney v. Krauss, 394 Pa. 380, at 383, 147 A.2d 369, points out, again quoting Lenahan v. Pittston Coal Mining Co., supra, that while no evasion should be tolerated and the rule rigidly enforced-- that of injecting insurance into the case-- nevertheless exceptions would be tolerated and, at p. 383, 147 A.2d at p. 371, it stated as follows: 'An examination of the instant record indicates that appellant's answer on cross-examination that he gave a statement to 'The insurance representative' falls within this exception.' See also Rodgers v. Ashley, 207 F.2d 534, 535 (3rd Cir.).
 
 
 38
 It can thus readily be seen that the mere mention of the word 'insurance' in the trial of a case is not fatal, but the context in which it is laid is of controlling importance.
 
 
 39
 Here, in the instant case, the court deliberately made inquiry, as did counsel, as to whom the witness, Roeschenthaler's, employer was, the answer being the 'Erie Insurance Company', and, accordingly, there is flatly posed, under the factual circumstances obtaining here, the question of whether or not the trial court committed error. We think not. Here, the facts of record disclose, we think it can fairly be said, overreaching on the part of the Erie Insurance Company. Roeschenthaler, in insurance company's claim adjuster, made two investigations of the defendant's car unbeknownst to the insured, defendant Borandi. The record further discloses that the insurance company did not inform him and it was first made known to him at the trial, by the trial judge, that his policy carried a reservation of right clause, enabling the insurance company to disclaim liability for Borandi under his coverage in the event that the decedent's administrator secured a verdict. Moreover and more importantly, it was requisite, in order that the jury might fairly evaluate his testimony, that it know the background for the same and what, conceivably, could motivate the same. Borandi had no counsel of his own. Zehner, the attorney of record for the defendant, represented the Erie Insurance Company and they paid for his services. Roeschenthaler, the witness, their representative, was paid by them for the investigation he made and was also paid $10 per hour for preparing his report for them and for testifying in court.
 
 
 40
 Reliance is placed upon Fleet Carrier Corp. v. Lahere, 184 Pa.Super. 201, p. 204, 132 A.2d 723, p. 724, where the court held that a new trial was in order where counsel, in his closing argument, stated: 'I assure you that notwithstanding what was argued to you, no difference what Mr. McCandless said or how large your verdict, I assure you that Mr. Lahere will not have to pay one cent of it.' One can be in complete agreement with this case, as well as with Hollis v. United States Glass Co., supra, because in both of these cases there was no reason for injecting the term 'insurance' into the case, except for a pecuniary one on the part of the plaintiff and, accordingly, as has been indicated above, it did not serve any purpose for the jury in evaluating testimony therein.
 
 
 41
 Finally, in its latest pronouncement, the Supreme Court of Pennsylvania, in Goodis v. Gimbel Brothers, supra, has confirmed the point of view here expressed in no uncertain and colorful language, as is his wont, by Justice Musmanno who, in speaking for the court, stated 420 Pa. at pp. 444-445, 218 A.2d at p. 577: 'Fortresses have been built around insurance carriers in personal injury cases to protect them from the oral bombardment by plaintiff attorneys that the defendants involved will not be subjected to financial hardship in the event of plaintiff's verdicts since the defendants are insured. If an insurance adjuster comes out of this fortress of protection and proceeds to engage in open battle with the plaintiff, he cannot expect to be regarded as a disinterested person seeking abstract justice, wholly unconcerned with the nature of the verdict. In attempting to discredit the plaintiff in this case by testifying to his conversation with her, contradicting what she had said, Heaney difinitely put himself on the side of the defendant and the jury was entitled to know that he had a direct interest in keeping in the treasury of the insurance company the money which Mrs. Goodis was trying to extract therefrom. Since, therefore, he became an interested witness, the court should not have clothed him in the armor of non-identification. He voluntarily entered into an adversary proceeding and consequently the plaintiff had the right to demand that he lift his visor so that the jury could see who he was, what he represented, and what interest, if any, he had in the results of the trial, so that the jury could appraise his credibility.'
 
 
 42
 It is submitted that the trial court's reason for the admission of Roeschenthaler's testimony, by way of explanation to the jury, amply protected the defendant from any prejudice which could possibly ensue.
 
 
 43
 The judgment of the lower court will be affirmed.
 
 
 
 [1]
 12 P.S. 1601, 1602 and 1604
 
 
 [2]
 20 P.S. 320.601 and 320.603