**Elliot FINEMAN and The Industry Network Systems, Inc., Plaintiffs,**

v.

**ARMSTRONG WORLD INDUSTRIES, INC., Defendant.**

Civ. A. No. 84–3837.

United States District Court, D. New Jersey.

June 25, 1991.

Steven M. Kramer, New York City, for plaintiffs.

Crummy, Del Deo, Dolan, Griffinger & Vecchione by John J. Gibbons, Newark, N.J. (Laurence H. Tribe, of counsel), Cambridge, Mass., Stryker, Tams & Dill by Edith K. Payne, Newark, N.J., Covington & Burling, by J. Randolph Wilson, Washington, D.C., for defendant.

## OPINION

BISSELL, District Judge.

### I. FACTS AND BACKGROUND

The present matter arises pursuant to several remaining motions in this action. First, defendant Armstrong has moved under Fed.R.Civ.P. 59 for a new trial, as an alternative to its motion for J.N.O.V. Second, Armstrong has separately moved under Rule 49 (pertaining to inconsistent verdicts) for a new trial. Finally, the plaintiffs have moved for "reformation of the judgment," requesting this Court to allow them to recover both the tort and antitrust awards.

The latter motion, even if it was not rendered moot by this Court's Opinion granting defendant's motion for J.N.O.V., would be (and is) denied for the reasons enunciated in its Opinion Regarding Entry of Judgment filed on May 6, 1991. Nothing presented in the papers supporting this

motion has persuaded the Court that its prior determination is incorrect.

Armstrong's motion under Rule 49 [1] may be disposed of as quickly as plaintiffs' motion concerning the judgment. This motion relates to jury answers to interrogatories concerning "overlap" amounts between compensatory awards for the tort claims and the antitrust claims.[2] This motion is denied without further discussion. This Court has vacated the judgment based upon the verdict in its earlier Opinion granting defendant's motion for J.N.O.V. Furthermore, even if the verdict remained, this Court grants defendant's motion for a new trial on the grounds enunciated below, and thus denies the motion under Rule 49 because such motion is unnecessary.

This Court issued its Opinion as to the motion for J.N.O.V. on June 20, 1991, granting defendant's motion in full. The present Opinion is to be considered in conjunction therewith, and so will not repeat the pertinent facts and background contained therein as such discussion is hereby incorporated by reference.

The present opinion is required in light of the fact that this Court granted the defendant's motion for J.N.O.V. in its entirety:

> If the motion for judgment notwithstanding the verdict, provided for in subdivision (b) of this rule, is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify grounds for granting or denying the motion for the new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment....

(Fed.R.Civ.P. 50(c)(1)).

The defendant asserts three grounds for its motion under Rule 59. First, it contends that the verdict is contrary to the clear weight of the evidence. Second, Armstrong asserts that it is entitled to a new trial because of improper, prejudicial arguments made to the jury by the plaintiffs' counsel. Third, Armstrong asserts that both the compensatory and punitive awards in this case are so grossly excessive as to shock the conscience, thus requiring a new trial.

## II. DISCUSSION

### A. Standards Governing Motions for a New Trial

In general, a trial court should grant a motion for a new trial when, in its opinion, "the verdict is contrary to the great weight of the evidence, thus making a new trial necessary to prevent a miscarriage of justice." *Roebuck v. Drexel University*, 852 F.2d 715, 736 (3d Cir.1988). "The authority to grant a new trial ... is confided almost entirely to the exercise of discretion on the part of the trial court." (*Id.* at 735 (quoting *American Bearing Co. v. Litton Industries*, 729 F.2d 943, 948 (3d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984)). Such discretion reflects the fact that "the district court was able to observe the witnesses and follow the trial in a way that [the Appellate Court] cannot replicate by reviewing a cold record." (*Id.*, citing *Semper v. Santos*, 845 F.2d 1233, 1237 (3d Cir.1988)).

The discretion of the court is not unlimited, however. Necessarily, when a motion for a new trial based on the weight of the evidence is granted, the court has:

> to some extent at least substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts.

---

**1.** Rule 49(b) provides in relevant part:
When the answers [to special interrogatories] are inconsistent with each other ..., judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

**2.** *See* Opinion Regarding Entry of Judgment, filed May 6, 1991 at 6–10, for a full discussion of the answers and this Court's initial reaction thereto. Despite said reaction, this Court finds it unnecessary to further consider the possibility that the questions are inconsistent.

*Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1352 (3d Cir.1991) (quoting *Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 90 (3d Cir.) (in banc), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)). As with a motion for J.N.O.V., "[a] district court may not substitute its own judgment for that of the jury simply because the court might have come to a different conclusion." *Grace v. Mauser–Werke Gmbh,* 700 F.Supp. 1383, 1387 (E.D.Pa.1988) (citing *Douglas W. Randall, Inc. v. A.F.A. Protective Systems, Inc.,* 516 F.Supp. 1122, 1124 (E.D.Pa.1981), *aff'd mem.,* 688 F.2d 820 (3d Cir.1982)). However, a careful analysis of permissible inferences the jury could reasonably draw from the evidence presented at trial does not invade the exclusive domain of the jury. *Nebel v. Avichal Enterprises, Inc.,* 704 F.Supp. 570, 574 (D.N.J.1989) (citing *Roebuck,* 852 F.2d at 736). Where the verdict is based on inferences which are "mere speculation", a new trial becomes necessary. (*Id.*) Thus, "the district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand." *Williamson,* 926 F.2d at 1352 (citing *EEOC v. Delaware Dep't of Health & Social Servs.,* 865 F.2d 1408, 1413 (3d Cir.1989)).

## B. *The Weight of the Evidence*

■ As this Court's J.N.O.V. opinion demonstrates, the record in this matter is critically devoid of that quantity and quality of evidence from which a jury might reasonably afford relief for the plaintiffs. Of necessity, the verdict is therefore also contrary to the great weight of the evidence for the same reasons as detailed in the J.N.O.V. Opinion. The verdict in this matter is the product of impermissible speculation, sympathy, and emotion. The jury decided this case with its viscera, not its reasoning, and therefore permitting the verdict to stand would constitute the gravest miscarriage of justice. Accordingly, the defendant's motion for a new trial on the basis that the verdict is contrary to the weight of the evidence is granted.

## C. *Attorney Misconduct*

Although the first ground for the new trial is sufficient on its own, this Court also chooses to consider the defendant's arguments concerning the conduct of plaintiffs' counsel. This conduct, particularly the repeated appeals to sympathy, speculation and passion rather than reason, is undoubtedly what produced the jury's verdict. Furthermore, conduct such as that engaged in by plaintiffs' counsel requires judicial attention, even if only to award a new trial. The Court determines, whether considered separately or in conjunction with the lack of evidence to support the verdict, Mr. Kramer's conduct demands the granting of a new trial.

■ In considering a motion for a new trial based on attorney misconduct, "the trial judge has considerable discretion in determining whether conduct by counsel is so prejudicial as to require a new trial." *Draper v. Airco, Inc.,* 580 F.2d 91, 97 (3d Cir.1978) (citing *Lewis v. Penn Central,* 459 F.2d 468 (3d Cir.1972); *Corbett v. Borandi,* 375 F.2d 265 (3d Cir.1967)). The Third Circuit has noted:

> [W]e wish to emphasize that we do not expect advocacy to be devoid of passion.... But jurors must ultimately base their judgment on the evidence presented and the rational inferences therefrom. Thus, there must be limits to pleas of pure passion and there must be restraints against blatant appeals to bias and prejudice. These bounds of conduct are defined by the Code of Professional Responsibility and the case law.

(*Draper,* 580 F.2d at 95); *see e.g. Salas by Salas v. Wang,* 846 F.2d 897, 907–908 (3d Cir.1988) (*Draper* standard reiterated and distinguished because there was only one "impassioned" statement). Of particular concern to this Court is Rule 3.4(e):

> A lawyer *shall not* ... (e) in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a

witness, [or] the culpability of a civil litigant . . .

(RPC 3.4(e)) (emphasis added). Violations of this rule and others, when the court determines that there is a "reasonable probability" that the jury's verdict has been influenced by the improper conduct of counsel, require the court to grant the motion for a new trial. *See e.g. Commercial Credit Business Loans, Inc. v. Martin,* 590 F.Supp. 328, 332–335 (E.D.Pa.1984) (Trial court granted plaintiff's motion for new trial where counsel offered his opinion, expressed indignation and outrage at the accused conduct, commented upon the conduct of witnesses and vouched for their credibility, all to the extent that there was a reasonable probability that the verdict was influenced by such conduct.); *Polansky v. CNA Insurance Co.,* 852 F.2d 626, 628 (1st Cir.1988) ("Courts have long recognized that statements of counsel's opinions or personal beliefs have no place in a closing argument of a criminal or civil trial.") (Citations omitted).

Cautionary instructions may be used to attempt to eliminate the prejudice resulting from improper statements by counsel. This Court made several such instructions, both immediately following the conduct and during its final instructions as to the relevant law.[3] It is beyond refute, however, that cautionary instructions do not necessarily remove the probability of prejudice:

> [T]he bench and the bar are both aware that cautionary instructions are effective only up to a certain point. There must be a line drawn in any trial where, after repeated exposure of a jury to prejudicial information . . . cautionary instructions have little, if any, effect in eliminating the prejudicial harm.

*City of Cleveland v. Peter Kiewit Sons' Co.,* 624 F.2d 749, 759 (6th Cir.1980) (quoting *O'Rear v. Fruehauf Corp.,* 554 F.2d 1304, 1309 (5th Cir.1977)); *Draper,* 580 F.2d at 96–97.

■ For the most part, this Court adopts the arguments of the defendant as they pertain to plaintiffs' counsel's conduct during the course of this trial, and particularly throughout his closing arguments. Armstrong has exhaustively briefed the issue, and quoted extensively from the transcripts.[4] Accordingly, this Court only summarizes the prejudicial conduct for purposes of this Opinion. *See e.g. Draper,* 580 F.2d at 97 ("In reaching this decision, we do not rely on any of the individual instances or types of impropriety. Rather, we have assessed the argument as a whole").

Mr. Kramer, during the course of his closing arguments in particular, repeatedly testified as to his own truthfulness and trustworthiness, although of course he was not a witness. (*See* Tr. quoted at Defendants' Main Br. at 36–38). His testimony on summation included supplying "facts" not in the record about what *he* knew, didn't know, found out, etc. (Defendants' Reply Br. at 31–34). He also expressed his opinion, on countless occasions, that Armstrong concealed information and lied during the course of the trial. (Defendants' Main Br. at 38–43). Furthermore, Mr. Kramer repeatedly referred to a crime and to a conspiracy in which Armstrong supposedly engaged, despite the fact that this Court directed a verdict in Armstrong's favor as to plaintiffs' civil conspiracy claims and there are, of course, no criminal claims involved in this civil lawsuit. (*Id.* at 70–72). References to crimes and criminals (often comparing witnesses to such celebrated figures as Jack Palance) undoubtedly persuaded the jury to fictionalize the claims herein and act out of a sense of drama rather than reality. (*See e.g. Henker v. Preybylowski,* 216 N.J.Super. 513, 518–519, 524 A.2d 455 (App.Div.1987)) (In granting the motion for a new trial, court

---

3. It was with the hope that these instructions had blunted the impact of such statements that the Court denied defendant's motion for a mistrial and submitted the case to the jury. (Tr. 41.9–41.16). The jury's unreasonable verdict demonstrates that that expectation was not realized. The denial of that mistrial motion does not preclude this Court from addressing the issue here.

4. Reference to the briefs of the parties herein are for convenience and should be deemed, where applicable, to be references to the portions of the record cited in those briefs.

described plaintiff's attorney's use of defendant's attorney as a target; "[p]erhaps none of these comments standing alone is out of bounds, but taken together they represent a deliberate effort by plaintiffs' attorney to have the jurors see themselves as destroyers of evil forces, personified by defendant and his attorney, that have been depriving his clients of justice ...").

Throughout his closing argument, Mr. Kramer repeatedly expressed his opinion as to the merits of Armstrong's case, the credibility of witnesses, and the culpability of Armstrong even as to claims not legitimately set forth by the plaintiffs. (*Id.* at 43–50; 70–72). On more than one occasion, this Court admonished Mr. Kramer to refrain from including his personal opinion in his argument;[5] despite such orders, he continued to assert his views with vigor.

During his closing, Mr. Kramer continuously asserted that all of Armstrong's witnesses were liars and perjurers, while emphasizing that this was a federal Court and the jury a federal jury. (*Id.* at 50–58). At the same time, Mr. Kramer accused the witnesses and Armstrong itself of various crimes, including theft and conspiracy (as noted above).

Perhaps most troubling to this Court is the unadorned, disparaging attack upon defense counsel throughout Mr. Kramer's closing argument. *See e.g. Draper,* 580 F.2d at 96 ("The final category of improper conduct committed by counsel is the repeated vituperative and insulting references to the defendants and defendants' counsel") (citations omitted); *see also* RPC 3.2 ("A lawyer ... shall treat with courtesy and consideration all persons involved in the legal process.")[6] Indeed, he began his closing by pointing out the "misrepresenta-tions" made by defense counsel in his closing argument, and continued to refer to defense counsel as liars despite this Court's admonition and cautionary instruction to the jury. (Defendants' Br. at 58–67). Mr. Kramer's argument to the contrary, that "[a]t no point in his closing argument did plaintiffs' counsel ever say that Mr. Wilson had lied," (Plaintiffs' Br. at 55), is contrary to the record. Indeed he pressed his own personal credibility and, having disparaged that of Mr. Wilson, then asked the jurors to contrast them. (Tr. 40.7:5–9).

Mr. Kramer even went so far, in a particularly egregious example of misconduct, as to infer that one defense attorney either counselled a witness to lie (as was suggested by the language he used), or engaged in sexual misconduct with a witness (as was suggested by his tone and the inuendo inherent in his statements):

> [Referring to defense witness Alan Abrahamson]: Look, when he got up here on the witness stand after spending 22 hours with Edith Payne, hold [sic] up in a conference room God knows what he was doing for 22 hours for three hours of testimony?
>
> \*     \*     \*     \*     \*     \*

That's perjury. He's admitting it. I cannot believe my ears. I really cannot. This is the same Alan Abrahamson, yeah, Ms. Payne's in the room. She's in the second row. There, flower dress. She spent 22 hours held up in a conference with Alan Abrahamson.

Now, what, ladies and gentlemen of the jury, Mr. Abrahamson's direct examination with Mr. Wilson was maybe three hours, three and a half hours? But they had to spend 22 hours with Mr. Abra-

---

5. This Court also admonished defense counsel to refrain, early during his closing argument, from expressing personal views. Counsel, who had obviously done so only inadvertently, obeyed the Court's order thereafter. Indeed, this incident shows that plaintiffs' counsel, who argued second, had the benefit of hearing this Court's view concerning the use of personal opinion during arguments before a jury, well before he began his own summation. He nonetheless repeatedly ignored this Court's direction.

6. If ever there were a time where a Court should admonish incivility by an attorney which this Rule is designed to deter, Mr. Kramer's *conduct throughout the trial has generated such* a case. Indeed, during the course of this trial, this Court specifically ordered that:

> Trial counsel's efforts are to be directed to the orderly, civilized completion of the present trial [w]ith the decorum and professionalism, both inside and outside the courtroom, which this Court has the right to expect and demand.

(Tr. at 25.8:5–9).

hamson to prepare him. And ask yourself something.

Now, I'm the first to admit you get up on the witness stand, it's your first time. Of course you're going to be nervous, that's natural. The first time I got up to do this I was scared to death. That's natural.

But I mean, if you're going to tell the truth, why do you have to be terrified? Why do you have to spend 22 hours preparing if all you're going to do is get up there, tell it the way it is, as they say, right?

Do you need 22 hours to prepare? To do what?

I know what they did. You know what they did. I don't have to tell you what they did during those 22 hours.

(Tr. 39.12:10–13; 39.74:5–24).[7]

Thus, the essence of Mr. Kramer's closing concerning defense counsel was that counsel had lied to the jury, had suborned perjury from witnesses (flavoring these comments with the titilating remarks regarding Ms. Payne), and had done it for money. He argued further that the jury could and should award punitive damages against Armstrong based in large measure upon such alleged conduct. Indeed, on the chart he placed before the jury, Mr. Kramer included "misrepresentations by counsel" as one of the reasons the jury should award punitive damages. At the next recess, this Court expressed concern with the propriety of alleged trial conduct as a basis for punitive damages, and asked plaintiffs' counsel to remove it from the chart. He did so, but continued to assert in his arguments that "perjury" and the misconduct of counsel constituted a basis for an award of punitive damages.

Mr. Kramer's opposition to this portion of the defendant's motion is singularly un-convincing. For example, Mr. Kramer quotes himself saying "To me, I'm not the smartest guy in the world. But I think overlap and compete are pretty close to me." (Tr. 39.20), and argues that this does not constitute opinion. Instead, he says, the statement is only a "rhetorical device" which defendant has taken literally. (Plaintiff's Br. in Opp. to Rule 59(b) Motion at 14–15). Mr. Kramer argues that his use of mere sarcasm could not work to inflame the jury and that many of his statements are "inferences," not testimony. (*Id.*) Considered with the other improprieties in his summation, however, these remarks also add to its prejudicial impact.

Contrary to Mr. Kramer's assertions, defense counsel did object to Mr. Kramer's conduct throughout the trial. Motions *in limine* were filed to limit certain prejudicial evidence and testimony; a motion was filed to limit closing argument;[8] a motion requesting a restraining order was filed, and numerous objections were made throughout. Requiring defense counsel to object to every single instance in this overladen record in which plaintiffs' counsel acted objectionably would cause considerable prejudice in the eyes of the jury. This is particularly true where so much of the accused conduct occurred during plaintiffs' closing argument. Furthermore, even if this Court found that defense counsel failed to make timely objections to Mr. Kramer's conduct, it would nonetheless grant the new trial motion in light of the extremely prejudicial conduct which occurred and the gross miscarriage of justice which resulted. In this regard, the Second Circuit has stated:

We are of the opinion that even absent these objections a new trial should have been granted in this case. It was the trial judge's affirmative duty to protect appellants from the grossly improper tac-

---

7. At the very least, the obviously intentional double entendre inherent in these crude statements was calculated to amuse the jury by personal embarassment of defendant's co-counsel. This is hardly a legitimate objective of a summation.

8. Prior to summations, Armstrong moved to limit plaintiffs' closing argument. (*See* Tr. 37.-

120–37.138). This Court, at the time, satisfied itself with certain advice to counsel which it expected would be heeded. Indeed, at that very point, Mr. Kramer stated that he was "very sensitive" to such concerns. (Tr. 37.134:8–12). Not only did plaintiffs' counsel fail to heed the Court's admonitions, but in fact deliberately ignored them throughout his closing arguments.

tics adopted by counsel for the appellee. This he failed to do.

The single most important task of a district judge presiding at a trial before a jury is to exercise that degree of control required by the facts and circumstances of each case to assure the litigants of a fair trial. This obligation does not arise only when objections are raised by one of the litigants or his counsel. Repeated improprieties by one counsel severely prejudice his adversary. Every trial lawyer knows that frequent objection is a potentially dangerous course of action the effect of which upon the jury cannot be estimated. Thus, the burden falls on the federal district judge to use his authority, whenever it becomes necessary, in such a way that the proceedings in the courtroom remain devoted to a reasoned and reasonable search for justice between the parties. *Brown v. Walter*, 62 F.2d 798 (2d Cir.1933).

*Koufakis v. Carvel*, 425 F.2d 892, 900–901 (2d Cir.1970).[9] Furthermore, contrary to Mr. Kramer's assertions, this Court was acutely aware of the fact that objections to closing argument are undesirable: "I might add Mr. Wilson that as far as objections on the summations are concerned, this goes to both sides obviously anybody ought to be reluctant to object to anyone else's summation." (Tr. 37.137).[10]

Particularly unconvincing is plaintiffs' counsel's effort to distinguish *Draper* on the question of attacking opposing counsel. In *Draper*, the attack on counsel was "without provocation or basis in fact." 580

F.2d at 95. Mr. Kramer therefore argues that his attack against defense counsel herein was based on evidence, including "factual discrepancies and inaccuracies to [defense counsel's] argument to the jury." (Plaintiffs' Br. at 29). Thus, he claims, it has a basis in fact and so was not prejudicial. (*Id.* at 37). Furthermore, he claims that because he raised the issue of credibility of counsel, "[t]his issue could be 'prejudicial' to a defendant only if the jury was more likely to find that defense counsel had been untruthful ..." (*Id.* at 38). This is a ludicrous argument. First, Mr. Kramer launched a full assault against the credibility and tactics of defense counsel without any basis whatsoever, except that he, Mr. Kramer, disagreed with Mr. Wilson's assessment of the evidence. It is one thing to dispute an adversary's position and argue that it is incorrect; it is quite another to accuse an attorney of making intentional misrepresentations for pecuniary gain or to justify his fee to his client. Second, in no way was counsel's veracity *ever* an "issue" upon which the jury could make "findings." Mr. Kramer, however, encouraged the jury to balance his and Mr. Wilson's personal credibility. (Tr. 40.7:5–9). The only issues for the jury to decide were those it was instructed to consider; plaintiffs' counsel could not suddenly create an "issue" for the jury in his closing argument.

Mindful of the considerable time and resources expended by the parties and the Court itself, this Court attempted to cure the numerous improprieties by instructions to the jury.[11] As is evidenced by the verdict in this matter, such instructions were

---

**9.** This Court certainly strove to honor the *Koufakis* directives. Hindsight being the great teacher that it is, this Court should probably have intervened more frequently, *sua sponte*, particularly as the summation of plaintiffs' counsel progressed with increasing improprieties. Frankly, this Court found those remarks so offensive and incredible that it believed the jurors would surely reach the same conclusion, reject that impassioned, vituperative rhetoric, focus on the paucity of true evidence supporting the plaintiffs' claims, and reach the only verdict which reason and deliberation would permit: a verdict for the defendant on all claims presented to the jury. (*See* this Court's Op. date June 20, 1991, granting defendant's motion for J.N.O.V.). The Court overestimated the jury's ability to be that discerning, and thus failed to

fully discharge its obligations as enunciated in *Koufakis*. It accepts that responsibility and corrects the resulting indefensible verdict by granting the motion for a new trial.

**10.** *See also* Tr. 40.3:14–16 ("I can understand why the defendants might not want to rise and object time after time in the course of summations. Obviously because of what takes place in front of the jury.")

**11.** This Court also permitted defense counsel a brief rebuttal to the charges made by Mr. Kramer in his closing argument. The extent of this rebuttal in no way was able to overcome the prejudice engendered by Mr. Kramer's lengthy, repeated misconduct:

to no avail. There is no doubt in this Court's mind that the verdict in this matter is the result of passion, prejudice, sympathy and totally unjustified outrage, instilled and fertilized by plaintiffs' counsel. The inferences which counsel asked the jury to make were unreasonable and illogical; only by prejudicing the jurors (as exemplified most dramatically in Mr. Kramer's summation) were plaintiffs able to obtain a verdict. Disparaging witnesses and defense counsel to such an extent undoubtedly added fuel to the flames of the jury's passion engendered by the other colorful yet prejudicial arguments of counsel. This Court's opinion regarding the defendant's motion for J.N.O.V., particularly those portions analyzing the evidence and the reasonable inferences therefrom, demonstrates the considerable extent to which this jury was led by the inflammatory rhetoric of plaintiffs' counsel down a path that fatally diverged from the evidence.

This Court notes that Mr. Kramer's conduct throughout the course of this trial has led to the imposition of a restraining order, consideration of motions for a mistrial,[12] delays resulting therefrom, and more. The defense counsel, as a result of plaintiffs' counsel's acts, were required to commit substantial time and energy to addressing tangential issues at key points during the trial.[13] For example, upon the close of plaintiffs' case and the motions for directed verdict, counsel and this Court were distracted from trial issues by Mr. Kramer's meddlesome letters to the New York Stock Exchange and the Securities and Exchange Commission. (See Tr. before Magistrate Haneke, March 4, 1991, and this Court's Opinion affirming, March 19, 1991 (Tr. 25.1–25.8)). Similarly astounding were this attorney's inexcusable letters directly to the directors of Armstrong which delayed summations by one week.[14] (See Op. Re-

> [T]he procedural rules of the Court [ ] do not allow me to respond to plaintiff's arguments on their claims against Armstrong and including those arguments I heard yesterday afternoon to the effect that Armstrong counsel made 24 misrepresentations.
>
> So, I ask you, ladies and gentlemen, please do not assume that my silence means that plaintiff's 24 points have any truth to them. They do not.
>
> On the contrary, every factual event I asked you to find was fully supported by credible evidence in the record. Plaintiff's assertions that those points were misrepresentations is not true, as you will find, when you examine the credible evidence.

(Tr. 40.86:7–19). Thus, Mr. Wilson attempted to surmount some of the prejudice engendered by Mr. Kramer at the same time that he remained within this Court's strict confines on rebuttal. (See Tr. 40.78–40.80). At the time, this Court had specifically declined to declare a mistrial on the eve of the submission of the case to the jury. (Id. at 40.78 ("There may or may not be grounds for a mistrial in the manner in which summation was conducted. That is an issue to be addressed at a later time . . . I won't comment on that.")) (See also Tr. 41.9–41.16).

12. For example, motions for a mistrial were heard twice on January 29, 1991, based on the same incident. (Tr. 3.88; 3.158–3.163). Plaintiffs were attempting to gain admission of evidence from Mr. Fineman involving two levels of hearsay. (See Tr. 3.4–3.11). Indeed, the discussion on January 29 was not the first time that plaintiffs had tried to seek admission of the same evidence. (Tr. 3.4–3.5). The Court once again excluded the evidence, and in doing so, further clarified its ruling to the point of giving examples. (Tr. 3.9–3.11). Despite such rulings (for which he was present), Mr. Fineman's testimony, as elicited by Mr. Kramer, (Tr. 3.3.86; 3.89–3.91) was dangerously close to the precluded evidence, thus causing numerous objections and motions for a mistrial. (Tr. 3.88; 3.89; 3.92).

The question of a mistrial also arose at two points during summation. (See Tr. 40.78; 41.9–41.16)

13. The Honorable G. Donald Haneke, United States Magistrate Judge, in considering defendant's motion for a restraining order, accurately found that:

> [This] whole thing was a stunt designed to influence Armstrong's position vis-a-vis your clients in a civil proceeding and when that didn't work, it was an attempt to get public regulatory bodies sicked on your opponents so they would be, at the very least, distracted from their full ability to concentrate on the trial which is coming to its completion very soon.

(Tr. of proceedings before Magistrate Haneke, March 4, 1991 at 35:18–24).

14. The direct result of submitting these letters, of course, was that Armstrong had to move quickly for relief. On April 4, 1991 Armstrong's counsel alerted the Court to the existence of the letter to the Board of Directors, and sought sanctions for contempt of the restraining order in place. This Court, of necessity in light of the

garding Entry of Judgment filed May 6, 1991 at 14). The only conclusion that this Court is able to reach is that plaintiffs' counsel deliberately set out to sabotage Armstrong's defense in every way possible, without regard to rules of conduct, rules of law, and orders and directions from this Court.

Other actions by Mr. Kramer are pertinent to the circumstances under which a new trial may be conducted. He effected a unilateral *de facto* cancellation of a date before this Court to settle the form of judgment upon the jury verdict, in order to attend a press conference (with Mr. Fineman) at Armstrong's corporate headquarters. (*Id.* at 15–16). In a further, bizarre development which just came to the Court's attention, a circumstance which might even be considered humorous if presented in isolation, the Court has learned that, since October 11, 1990, Mr. Kramer has been unauthorized to practice law in the State of New Jersey for failure to make his required contributions to the Clients' Security Fund.[15] Considered in the context of Mr. Kramer's other conduct in connection with this case, however, both inside and outside the courtroom, this development is but further evidence of Mr. Kramer's complete disregard for rules and procedures governing the propriety and civility of an attorney's conduct. Regretfully, his transgressions of this sort have not been limited to the present matter.[16]

Of course this Court is not going to void the present verdict and grant a new trial solely because of the lack of Mr. Kramer's authority during the trial to practice law before the courts of the State of New Jersey. If, as and when any new trial transpires in this matter the issue of his standing before the bar can be addressed at that time. Once again, however, considered in connection with his other conduct in this case which (given its pervasivness) is substantially likely to recur upon any retrial, this Court, should this action be remanded for a new trial on any issue, will then entertain a motion, and might even issue its own order to show cause, as to why Mr. Kramer should not be replaced as plaintiffs' trial counsel, in the event that the plaintiffs don't make that choice voluntarily.[17]

## CONCLUSION

■ This Court was present during the entire trial and has carefully reviewed the record herein. It observed the conduct and demeanor of plaintiffs' trial counsel, and

serious nature of the infraction, delayed continuation of the trial for over a week in order that Armstrong could prepare a motion, Mr. Kramer could respond, and a hearing could be held. Armstrong thereupon moved for contempt, for disqualification of Mr. Kramer from the case, and other relief. (*See* 36.4–36.10). These actions of plaintiffs' counsel, precipitating a one-week delay after the close of evidence and before summations, and diverting the efforts of defense counsel at this critical point, demonstrate further prejudice visited upon Armstrong in defending this case and add support for its new trial motion.

15. According to the New Jersey authorities, Mr. Kramer provided them with a check for payment in full which was received on June 18, 1991. At this writing, it is not clear whether he is yet reinstated, although that would be expected.

16. Mr. Kramer has previously been sanctioned by other courts in this Circuit. *See Matthews v. Freedman,* 128 F.R.D. 194 (E.D.Pa.1989), *aff'd,* 919 F.2d 135 (3d Cir.1990) (directing Mr. Kramer personally to pay an adversary's counsel fees

under 28 U.S.C. § 1927, reprimanding him for violating Fed.R.Civ.P. 11, and referring the matter to the Disciplinary Board of the Pennsylvania Supreme Court); *Rubin v. Buckman,* 727 F.2d 71 (3d Cir.1984) (affirming the result below and also noting the district court ruling that plaintiff's attorney, Mr. Kramer, had committed "a flagrant violation" of Rule 11); *Schwartz v. Hospital of the University of Pennsylvania,* 1989 WL 64286 (E.D.Pa.1989) (in obstructing a settlement, "[t]his court concludes that plaintiffs' counsel, Mr. Kramer, and plaintiff ... acted in bad faith").

17. The Court notes the arrival of John J. Gibbons, Esquire, of counsel to the firm of Crummy, Del Deo, Dolan, Griffinger and Vecchione of Newark, New Jersey, as co-counsel for the plaintiffs on the present motions. This Court does not know, of course, whether that affiliation will continue at any subsequent stage of these proceedings either here or in any other court. Should a retrial be ordered, however, this Court would of course welcome Mr. Gibbons and his firm as plaintiffs' trial counsel, for their reputation and record before this Court in numerous appearances are impeccable.

recalls vividly both the contents and tone of his remarks. Based on this experience with the record, and with the atmosphere which pervaded this trial, this Court finds that failure to grant the defendant's motion for a new trial would constitute a gross miscarriage of justice. The Court's curative instructions were to no avail in the face of Mr. Kramer's pervasive and flagrant appeals to speculation, sympathy, outrage and revenge from the jury. The cumulative effect of all such conduct is far greater than that experienced by the Court on a day-to-day basis. Indeed there could be no stronger testament to the success of plaintiffs' improprieties than the indefensible verdict reached by the jury. For all the reasons set forth above, the defendant's new trial motion is granted.[18]

**18.** Defendant Armstrong has alternatively moved for a new trial on the damages awards, even if the Court did not order a new trial as to both liability and damages. Since the Court has done so, it could decline to address defendant's more limited motion. In the interest of completeness, however, the Court will briefly address that motion. If it had denied defendant's motion for a new trial in all other respects, the Court would also deny to defendant a new trial on the sole issue of the quantification and calculation of compensatory damages on either the tortious interference or antitrust claims. There was conflicting evidence regarding such damages, and adequate support for the figures adopted by the jury. (Because of the other grounds for granting a new trial which the Court has discussed above, however, the Court reiterates that any new trial which might take place here will address both liability *and* damages as to any claim remanded.) The jury award of $200,000,000 in punitive damages, however, is so grossly excessive as to shock the conscience of the Court (and any reasonable reviewer of the record). No more clearly than in this collossal figure does the jury demonstrate that its verdict was the product of vengeful passion and bias, created and fueled by the direct, inflammatory, improper appeals of plaintiffs' counsel to those very emotions. The interests of justice cry out for a new trial as to the quantum of punitive damages in order that the grave miscarriage of justice reflected by the jury's excessive award can be rectified.