ISCO INTERNATIONAL, INC., Plaintiff

v.

CONDUCTUS, INC., and Superconductor Technologies, Inc., Defendants

No. 01–487 GMS.

United States District Court, D. Delaware.

Aug. 21, 2003.

Richard H. Richards, III of Richards Layton & Finger, Wilmington, Delaware, and John F. Sweeney, Mark J. Abate, and Tony V. Pezzano of Morgan & Finnegan, L.L.P., New York, New York, for Plaintiff.

Richard L. Horwtiz, and David E. Moore of Potter Anderson & Corroon LLP, Wilmington, Delaware, and Donald F. Parsons, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Chadbourne & Parke LLP, of New York, New York (Lawrence B. Goodwin, Daniel Basov, and Dennis C. Hopkins of counsel), Heller Herman White & Mcauliffe LLP,

Menlo Park, California (Alexander Brainerd, Michael K. Plimack, and Christian E. Mammen of counsel) for defendants.

## MEMORANDUM OPINION

SLEET, District Judge.

## I. INTRODUCTION

The plaintiff, ISCO International, Inc. ("ISCO"), filed the above-captioned suit against Conductus, Inc. ("Conductus") and Superconductor Technologies, Inc. ("STI") on July 17, 2001, alleging infringement of U.S. Patent No. 6,263,215 ("the '215 patent"). A thirteen-day jury trial was held between March 17 and April 2, 2003. On April 3, 2003, the jury returned a verdict finding that: (1) claims 10, 15, 16, and 17 of the '215 patent are invalid as obvious; (2) the '215 patent is unenforceable due to inequitable conduct; (3) the accused products do not infringe the patent-in-suit; (4) ISCO committed unfair competition in making certain marketplace representations about its patent; (5) STI is entitled to damages of approximately $3.8 million; and (6) Conductus is entitled to damages of $35,077.

During the course of the trial, both parties properly moved for judgment as a matter of law ("JMOL") pursuant to Federal Rule of Civil Procedure 50. The court reserved judgment on all JMOL motions. Following the jury's verdict, both parties filed post-trial motions. Presently before the court are: (1) ISCO's Renewed Motion for Judgment as a Matter of Law and for a New Trial (D.I.462); (2) the defendants' Motion for Entry of Judgment and Proposed Findings of Facts and Conclusions of Law on the Issue of Inequitable Conduct (D.I.472); (3) the defendants' Motion to Strike, in Part, the Reply Brief of ISCO in Support of its Renewed Motion for Judgment as a Matter of Law and for a New Trial, or in the Alternative to File a Surreply (D.I.508); and (4) the defendants' Motion for Attorneys' Fees and Disbursements (D.I.469). The following is the court's ruling regarding all pending post-trial motions.

## II. DISCUSSION

### A. ISCO's Renewed Motion for Judgment as a Matter of Law

■ Pursuant to Federal Rule of Civil Procedure 50, a court may rule against a party as a matter of law after the moving party is fully heard on an issue at trial, if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993) (citation omitted). If the court denies a motion for JMOL during trial, the motion may be renewed within ten days of entry of judgment in the case. FED. R. CIV. P. 50(b). To prevail on a renewed motion for JMOL following a jury trial, a party " 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings.' " *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed.Cir.1998) (quoting *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir.1984)). " 'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin–Elmer Corp.*, 732 F.2d. at 893. In assessing the sufficiency of the evidence, the court must draw all reasonable inferences from the evidence in the light most favorable to the nonmovant. *Id.; Richardson–Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir.1997). The appropriate inquiry is whether a reasonable jury, given the facts before it, could have arrived at the conclu-

sion it did. *Dawn Equip. Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1014 (Fed.Cir. 1998). The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin–Elmer Corp.*, 732 F.2d at 893.

ISCO moves for judgment as a matter of law on several grounds. It contends that there is no substantial evidence for the jury's findings that: the '215 patent claims are invalid as obvious; the patent is unenforceable because of inequitable conduct; ISCO acted in bad faith and committed unfair competition; the defendants are entitled to unfair competition damages; and the '215 patent claims are not infringed by STI's Superfilter III Product. The court will address each of these contentions in turn.

### 1. Obviousness

■■■ The plaintiff argues that there is no substantial evidence from which a jury could find independent claim 10 of the '215 patent obvious pursuant to 35 U.S.C. § 103. Section 103 states:

> A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103 (2003). Accordingly, when determining obviousness, the essential question is "whether the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable

likelihood of success, viewed in the light of the prior art." *In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed.Cir.1988) (citations omitted). This analysis rests on several factual inquiries: the scope and content of the prior art; differences between the prior art and the claims at issue; and the level of ordinary skill in the pertinent art. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Secondary considerations, such as the commercial success of the invention, long felt but unsolved needs in the art, and the failure of others to solve the problem, also may be considered. *Id.* at 17–18, 86 S.Ct. 684. As with all defenses of invalidity, the defendants were required to prove obviousness by clear and convincing evidence. *Custom Accessories, Inc. v. Jeffrey–Allan Industries, Inc.*, 807 F.2d 955, 961 (Fed. Cir.1986).

At trial, the defendants presented evidence of obviousness based upon the following: (1) a report[1] produced for the Advanced Research Projects Agency ("ARPA report"); (2) an article[2] by Mark A. Robertson; (3) knowledge in the art regarding the elements of the invention, which a person of skill in the art would have been motivated to combine; and (4) independent development of the invention.

### a. The ARPA Report

The defendants argue that the ARPA report, alone and in combination with other references, renders the claimed invention obvious. The report was prepared by the consulting firm of Booz Allen Hamilton for the Advanced Research Project Agency of the United States Department of Defense. *See* DX–1052 (the ARPA report). The report represents the consulting

---

1. *HTSC Dual Use Applications Survey—Progress Report: HTS Filter Applications/Cellular Telephone Base Station Equipment* (Feb.1995).

2. *Two Applications of HTS Technology on an Airborne Platform,* produced by the Advanced Research Projects Agency, SPIE PROCEEDINGS 2156 (Jan.1994).

firm's investigation of "the potential application of high temperature superconducting (HTS) products in the cellular communication base station equipment market." *Id.* at I–1. The report discloses a cryogenically cooled cellular receiver front end, with a plurality of thin-film HTS filters, a plurality of amplifiers, and a switched bypass circuit for bypassing the HTS filters in the event of a cooler failure. *Id.* at III–5, IV–11, V–2; Tr. 1521:10–1522:17; 1642:25–1643:21.

### 1. The Report's Status as Prior Art

■ ISCO first objects that the ARPA report is not prior art to claim 10 of the patent-in-suit. The report was disseminated publicly on February 7, 1995. The first provisional patent application leading to the '215 patent was filed on August 9,

1995. Normally, then, the report would be considered prior art to the claimed invention. ISCO maintains, however, that the inventors of the claimed invention conceived of the invention before February 7, 1995, and exercised reasonable diligence from a date prior to February 7, 1995 through a reduction to practice of the invention. Finally, ISCO maintains, the first provisional patent application supports the subject matter of claim 10 of the '215 patent. Therefore, the plaintiff argues, no reasonable jury could have found that the ARPA report constitutes prior art for purposes of § 102(b).

To remove the report from the prior art of the claimed invention, ISCO must have shown that the inventors conceived of the claimed invention [3] before the publish date

**3.** Citing *In re Stempel,* the plaintiff argues that its corroborating evidence need show a conception of only those elements of the invention as disclosed in the disputed reference. *Stempel,* 44 C.C.P.A. 820, 241 F.2d 755, 759 (Cust. & Pat.App.1957) ("[U]nder the law all the applicant can be required to show is priority with respect to so much of the claimed invention as the reference happens to show."). Later caselaw has refined this holding, however. For example, in *In re Tanczyn,* the court wrote that it was "necessary ... to restrict somewhat certain broad language in *Stempel* ... particularly" the statement cited by ISCO. *In re Tanczyn,* 52 C.C.P.A. 1630, 347 F.2d 830, 831 (Cust & Pat. App.1965). The court first noted that *Stempel* entailed a § 102(a) anticipation challenge, and that a different standard may apply to references used to challenge a patent on a § 103 obviousness basis: "A different situation [than in *Stempel*] may prevail when the rejection is based upon 35 U.S.C. § 103. In such a case the purpose of an affidavit is to establish that the claimed invention was made by the applicant before the effective date of a reference relied upon to show that the invention was obvious." *Id.* at 831. It also emphasized that the *Stempel* rule is limited to prior possession of a part of the invention, *i.e.,* something falling within the scope of the claim, a standard particularly applicable to inventions of chemical compositions:

Those statements [regarding the scope of the invention that must be shown] were entirely valid ... as applied to the facts in *Stempel* where the reference showed a species of the generic invention being claimed.... We never intended by the language used in *Stempel* to authorize the overcoming of references by affidavits showing that the applicant had invented, prior to the reference date, a part, some parts, or even a combination of parts, used to create an embodiment of his claimed invention, where the part or parts are not within the scope of the claims being sought.... The primary consideration is whether, in addition to showing what the reference shows, the affidavit also establishes possession of either the whole invention claimed or something falling within the claim, in the sense that the claim as a whole reads on it.

*Id.* at 831–32.

Unlike in *Stempel,* of course, the case at bar entails an obviousness challenge, and not a rejection pursuant to § 102(a). Moreover, it cannot be said that the present case involves a chemical composition, alloy, or other invention which is a "species" of the generic claimed invention. As such, ISCO must show conception of the material claimed in the reference and "the whole invention." Jury Instruction 6.7, to which ISCO stipulated, requiring a conception "of the claimed invention," sufficiently captures this inquiry.

**496**

of the report, or at least as much of the invention that any remaining differences between the report and the invention would be obvious to a person skilled in the art, and worked diligently thereafter to reduce the invention to practice. *See* 35 U.S.C. § 102(g); [4] *see also In re Spiller,* 500 F.2d 1170, 1178 n. 5 (Cust. & Pat.App. 1974).

At trial, Dr. Robert Yandrofski, one of the named inventors of the claimed invention, testified that he conceived of the elements of claim 10 probably around May or June of 1994, but certainly no later than December of that year. Tr. 2527:12–25. Co-inventor Gerhard Koepf testified to the same effect. Tr. 1882:13–1884:5; 1904:15–19; 1908:2–1911:17. The plaintiff also introduced documents to attempt to corroborate a conception date of December 1994. Of these, the plaintiff particularly relies upon PTX–299,[5] a draft project proposal dated December 19, 1994 and entitled "Cryo–REACH Base Station Prototype." The proposal details a front end hardware system for application to civilian and military wireless communications. PTX–299 at 1. The proposed system includes a "cold front end" for cryogenically cooling its components. *Id.* at 1, 5, 7. The proposal indicates that its prototype comprises "a tower-mounted receiver 'cold front end' that incorporates *a* highly selective and electronically-tunable band pass filter ...

and *a* low noise amplifier...." *Id.* at 1–2 (emphasis added). A schematic drawing at the end of report, however, indicates a system with multiple filters and amplifiers. Thus, the document appears to disclose a "plurality of planar filters" and "a plurality of amplifiers." There is no indication, however, of a "cooling member configured to cool simultaneously" the filters and amplifiers, as required by claim 10.[6] Thus, the document does not disclose the claimed invention. The same is true of PTX–363, a draft version of the same project proposal. Neither do the documents disclose a bypass circuit with sensors to monitor operational parameters and a mechanism for automatically activating the switches accordingly, as required by the patent. Indeed, the plaintiff has pointed to no corroborating document showing that the inventors possessed "the whole invention" prior to the presumed conception date. Therefore, the jury reasonably could have found that ISCO did not carry its burden to establish by clear and convincing evidence that the inventors were entitled to an earlier conception date.

Because the court has concluded that the jury reasonably concluded that the inventors did not conceive of the invention before the published date of the ARPA report, there is no need to consider whether the inventors thereafter diligently re-

4. Although § 102 relates to prior invention by another, anticipation, and abandonment, its standard for determining prior art is applied to the § 103 obviousness inquiry as well. *See, e.g., Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1568 (Fed.Cir.1987), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987) ("Before answering *Graham's* 'content' inquiry, it must be known whether a patent or publication is in the prior art under 35 U.S.C. § 102.") (citing *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)); *Ex parte Andresen,* 212 U.S.P.Q. 100, 102 (Pat.& Tr. Office Bd.App. 1981) (citing congressional committee record

and commentary and concluding that Congress intended § 103 to "includ[e] all of the various bars to a patent as set forth in section 102").

5. PTX–299, referred to during Dr. Yandrofski's testimony, apparently was mistranscribed as "PTX–229." *See* Tr. 2631:18.

6. Indeed, the plaintiff concedes this point as to the amplifiers when it argues there is no motivation to modify the report to cryogenically cool the plurality of amplifiers. *See* Pl.'s Reply Brief (D.I.504) at 28–30.

duced the invention to practice. As such, the ARPA report may be considered prior art to the invention of the '215 patent.

### 2. The Report's Role in the Obviousness Inquiry

■ At trial, the defendants adduced evidence that the ARPA report renders the invention of the '215 patent obvious. This evidence included the testimony of Mr. Elliot Drucker and Dr. Stephen Heppe, experts with several years of experience in the cellular industry, particularly regarding receiver front end technologies. These experts reviewed the prosecution history of the '215 patent, the patent claims, the state of the art at the relevant time period, and the ARPA report, and concluded that the reference rendered claim 10 obvious to any person of ordinary skill in the art. *See, e.g.*, Tr. 1524:6–11 (reflecting Mr. Drucker's testimony that the PTO "absolutely" would not have granted the '215 patent had it known about the ARPA report). The jury was entitled to rely upon this evidence.

Regarding the motivation to modify the ARPA report to provide cryogenically cooled amplifiers, Mr. Drucker testified that several other prior art references, including the Robertson article, a graduate thesis by Daniel J. Drolet (DX–1068), and an article by K.B. Basin and S.S. Toncich (DX–1096), showed such a configuration. The plaintiff concedes that these prior art sources teach cryogenically cooled amplifiers. *See* Pl.'s Reply Brief at 30. In addition, Mr. Drucker, Dr. Heppe, and one of ISCO's experts, Dr. Vincent Poor, testified that placing the amplifiers inside the cryocooler would reduce noise, which was very desirable because noise generated by the amplifiers limits the cellular base station's sensitivity in receiving signals. *See, e.g.*, Tr. 1480:16–21.

Mr. Drucker also testified regarding the motivation to modify the report to provide an automatic bypass. Such a modification would be motivated by the desire to ensure continuous, unbroken service of the front end. Tr. 1557–59. Further, it would be obvious to use a bypass which is automatically controlled based on operational parameters. This is particularly true in light of a publication by Quadra which describes the use of a tower-mounted conventional amplifier using an automatic bypass. Tr. 1560–62. Dr. Heppe also testified regarding a brochure published by ISCO which describes a cryogenically cooled receiver front end with an automatic bypass. Tr. 2901–02.

Although ISCO urges that neither of these references discloses an automatic bypass which is routed "around the receiver front end" as required by claim 10, the defendants provided evidence that this element of the bypass circuit also would be obvious. For example, Mr. Drucker testified that no person of ordinary skill in the art would design a bypass circuit that routed around the filter only and not the amplifier, because such a design would be awkward because the cryocooler would have to be penetrated with a wire for each filter/amplifier combination, and would be more costly than a design in which the bypass is routed around the entire cryocooler. Tr. 1635–1637. Bypassing the entire cryocooler also would be advantageous because it would allow the system to respond to a failure of the amplifiers or the filters. Tr. 1637. Furthermore, Mr. Drucker pointed out that the Robertson article discloses a bypass circuit which bypasses the entire cryocooler. Finally, Dr. Heppe testified that one skilled in the art would be motivated to bypass the filter and the amplifier because to do otherwise would reduce the signal strength and increase the noise interference. Tr. 2156. Based on this evidence, then, the jury rea-

sonably could have determined that it would have been obvious to modify the ARPA report to include cryogenically cooled amplifiers and an automatic bypass routed around the receiver front end. The court cannot conclude that the jury's verdict, given all of the evidence before it, was unreasonable or not based on substantial evidence.

### b. The Robertson Article

The defendants also adduced testimony regarding an article authored by Mark A. Robertson which disclosed a military surveillance system. Dr. Heppe testified that the Robertson article discloses each element of claim 10 of the '215 patent, that there was a suggestion or motivation to modify the teachings of the article to apply it to the cellular field, and that those teachings would have rendered the patented invention obvious. Tr. at 2066:15–2087:20. In light of such evidence, a reasonable jury could have determined that the claimed invention was, indeed, obvious.

### c. Knowledge in the Art

Moreover, the defendants presented evidence that all of the elements of claim 10 were well-known in the art at the time of the claimed invention, and that it would have been obvious to a person of ordinary skill in the art to combine them. This evidence included: testimony by Mr. Drucker that a cryogenic package including HTS filters and amplifiers in a cooler, and the use of an automatic bypass, were well-known concepts in the art; the O'Malley patent, which discloses a plurality of filters and a plurality of amplifiers in a cryogenic cooler; the Drolet thesis and the Bhasin article, which teach cryogenically cooled amplifiers; testimony by Dr. Heppe, who discussed prior art publications disclosing a cryogenic package and opined that such a concept was well-known

in the art, that the use of automatic bypasses was well-known in the industry, and that the problem of system reliability suggested a motivation to combine the cryogenic package with an automatic bypass; the Quadra brochure detailing a tower-mounted amplifier that included an automatic bypass; evidence that Superconducting Core Technologies, Inc. ("SCT"), the original assignee of the patent-in-suit and ISCO's predecessor in interest, advertised a cryogenic receiver front end for cellular application with an automatic bypass and temperature sensors no later than September of 1994; and testimony by Dr. Greg Hey–Shipton, STI's Vice President of Engineering, and Dr. Heppe that STI had used bypass switches in certain of its projects more than one year before the earliest provisional application leading to the '215 patent. Thus, even without considering the ARPA report and the Robertson article, there was substantial evidence to support the jury's finding that the claimed invention was obvious.

### d. Independent Development

Finally, in furtherance of its defense of obviousness, the defendants also presented evidence that the claimed invention was independently developed by others in the industry at about the same time as the claimed invention. *See Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1460 (noting that simultaneous development of invention "may or may not be an indication of obviousness when considered in light of all the circumstances"); *see also* Jury Instruction 6.20 ("Independent making of the invention by persons other than the inventor prior to or about the same time [as the inventors] can be evidence that the invention would have been obvious."). This evidence included project proposals presented by STI to Motorola and Ericsson beginning in 1992, and STI memoranda and

articles describing various cellular projects under development. There also was testimony from the former chief technology officer of Conductus, John Rowell, that Conductus had developed a cryogenic package, as well as an automatic bypass, by 1993 and September of 1994, respectively. Tr. 1654:11–1670:9; 1670:12–1677:8. In addition, the defendants offered evidence that in September of 1994, ISCO, at the time unrelated to SCT or Dr. Yandrofski, developed a cryogenically cooled receiver front end with an automatic bypass and temperature sensors. Tr. 1141:16–1144:8. Finally, Dr. Hammond and Dr. Heppe opined, after having reviewed these references, that each of the elements of claim 10 was independently developed by others, and that there existed a motivation to combine those elements. *See* Defs.' Answer Brief at 21–24 (citing relevant portions of trial transcript). A reasonable jury could have concluded that such evidence is probative of obviousness.

It is clear that there was substantial evidence from which the jury could have concluded that the invention of the '215 patent was obvious. This evidence included testimony by several expert witnesses who opined, as persons skilled in the relevant art, that various references disclosed all of the elements of the patented invention, that it would have been obvious to a person of ordinary skill in the art to combine them, and that there was a motivation to do so. As such, there was substantial evidence from which the jury could find that the invention was obvious, and the court will not disturb this aspect of the jury's verdict.

### 2. Inequitable Conduct

■ Patent applicants and their legal representatives have a duty to prosecute applications with candor and good faith. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172,

1178 (Fed.Cir.1995); 37 C.F.R. § 1.56(a). A breach of this duty occurs when an individual associated with filing and prosecuting a patent application fails to disclose material information, or submits false material information, with an intent to deceive. *Union Pacific Resources Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 693 (Fed.Cir.2001). To prove such a breach, the defendants must establish by clear and convincing evidence that: (1) the omitted or false information was material to patentability of the invention; (2) the applicant had knowledge of the existence and materiality of the information; and (3) the applicant intended to deceive the PTO. *Molins*, 48 F.3d at 1178. "Materiality and intent to deceive are distinct factual inquiries, and each must be shown by clear and convincing evidence." *Life Tech, Inc. v. Clontech Lab, Inc.*, 224 F.3d 1320, 1324 (Fed.Cir.2000). A finding of inequitable conduct renders the subsequently issued patent unenforceable. *Id.*

ISCO maintains that the issue of inequitable conduct must be decided by the court and that, in any case, there is no substantial evidence from which the jury could have found the patent unenforceable because of inequitable conduct.

#### a. Is Inequitable Conduct an Issue for the Court or the Jury?

■ As the phrase connotes, the defense of inequitable conduct springs from equitable principles. As such, the ultimate determination of the issue generally lies with the court. *See, e.g., Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1318 (Fed.Cir.2000), *reh'g and reh'g en banc denied* (2000) ("The defense of inequitable conduct is entirely equitable in nature, and thus not an issue for a jury to decide."). Nevertheless,

[t]here are a variety of ways in which the district court may choose to handle

the issue of inequitable conduct during a jury trial.... Some courts have reserved the entire issue of inequitable conduct unto themselves; some have submitted special interrogatories to the jury on the facts of materiality and intent; and some have instructed the jury to find and weigh the facts of materiality and intent and decide the ultimate question of inequitable conduct, as in the case at bar.

*Hebert v. Lisle Corp.,* 99 F.3d 1109, 1114 (Fed.Cir.1996); *see also Baxter Healthcare Corp. v. Spectramed, Inc.,* 49 F.3d 1575, 1584 (Fed.Cir.1995), *cert denied,* 516 U.S. 906, 116 S.Ct. 272, 133 L.Ed.2d 194 (1995) (noting that "inequitable conduct is a matter for the trial judge, and not the jury," but recognizing that the underlying factual issues may be determined by a jury).

In the present case, the parties did not expressly consent to a jury trial of the issue of inequitable conduct. Indeed, although the plaintiff ultimately stipulated to Jury Instructions 7.1–7.4, leaving the issues of materiality, intent, and the balancing of these elements to the jury, it also consistently objected that "this issue should be decided by the Court." *See* Joint Proposed Final Jury Instructions (D.I.420) at 66–71; *see also* transcript of February 24, 2003 pre-trial conference at 64; Tr. 187:15–188:14. It is unclear to the court whether the plaintiff intended to consent to a jury trial of the underlying factual issues, seeking a judicial determination of only the ultimate balancing question, or whether it sought a judicial determination of the entire issue of inequitable conduct. The defendants, for their part, seemed to consent to a jury trial of the factual issues, agreeing that the ultimate determination of inequitable conduct is for the court. *See* pre-trial conference Tr. at 64; Trial Tr. 187:15–188:14. As such, the court will treat as advisory the jury's verdict regard-

ing inequitable conduct, and adopt it if it is supported by substantial evidence.

#### b. Materiality

 ISCO first argues that the defendants did not prove by clear and convincing evidence that the ARPA report constituted material information. Information is material if it establishes a *prima facie* case of a claim's unpatentability, alone or in combination with other information, or it refutes or is inconsistent with an applicant's position in asserting an argument of patentability to the PTO. 37 C.F.R. § 1.56(b) (2003). Information that is cumulative or less material than other references already before the patent examiner, however, need not be disclosed. *Id.; GFI,* 265 F.3d at 1274. Any doubt regarding the materiality of a reference should be resolved by disclosure. *GFI,* 265 F.3d at 1274 (holding that it was "incumbent" on the patentee to disclose a "potential priority conflict"); *LNP Engineering Plastics, Inc. v. Miller Waste Mills, Inc.,* 275 F.3d 1347, 1361 (Fed.Cir.2001) ("[W]hen a question of materiality is close, a patent applicant should err on the side of disclosure.").

 In this case, the allegedly withheld information is the ARPA report. As discussed above at length, the report discloses a cryogenically cooled cellular receiver front end, with a plurality of planar HTS filters, a corresponding plurality of amplifiers, and a switched bypass circuit for bypassing the HTS filters in the event of a cooler failure. Tr. 1521:10–1522:17; 1642:25–1643:21.

Two of the defendants' expert witnesses, Mr. Drucker and Dr. Heppe, testified that the report rendered the subject matter of claim 10 obvious. Tr. 1545:7–1545:22; 2182:2–2183:10. Mr. Drucker also testified that the ARPA report was "far more relevant" to the subject matter of claim 10

than any other reference cited during prosecution of the '215 patent because: (1) it discloses far more elements for precisely the same application than any of the cited references; (2) it discloses, among other things, an automatic bypass in the same context as the bypass of the patented invention; and (3) the inventors would not have been able to make the same arguments that were made to the patent examiner had the ARPA report been presented to him. Tr. 1570:25–1474:7. Moreover, ISCO's own experts, Dr. Nettleton and Dr. Poor, conceded that the report discloses more elements of claim 10 than any other reference before the examiner during the prosecution of the '215 patent. Tr. 2457:20–2462:17. This represents substantial evidence from which the jury reasonably could conclude that the ARPA report was, indeed, material to the patentability of the claimed invention.

■ When the issue of inequitable conduct is submitted to a jury, the court may assume that the jury resolved the evidentiary facts as required to support the verdict. *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737 (Fed.Cir.2002); *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed.Cir.1988) ("Judges must accept the factual findings, presumed from a favorable jury verdict, which are supported under the substantial evidence/reasonable juror standard."). If the verdict is supported by substantial evidence, it will not be disturbed. *Id.* Here, the jury concluded that the ARPA report was material information relative to the '215 patent. The jury must have concluded that the ARPA report established a *prima facie* case of the unpatentability of claim 10, and/or that it refutes or is inconsistent with the applicant's position in asserting that claim 10 was patentable. There was substantial evidence, as described above, to support these findings. Based on the

evidence presented at trial, the court concurs with the jury's verdict and independently concludes that the ARPA report was material information. Thus, the report should have been disclosed to the PTO.

■ Regarding Dr. Yandrofski's knowledge of the materiality of the report, there was substantial evidence, as discussed above, that a person of ordinary skill in the art would have regarded the report as highly material to the claimed invention. Indeed, there was substantial evidence that the report rendered the invention obvious. In addition, the defendants presented evidence that the specific subject matter of the report, the application of HTS filter technologies in cellular telephone base stations, comprised the same technology as that of SCT's flagship product at that time, the REACH front end receiver. Tr. 1883:12–18; 1783:16–1784:9. There was evidence that the organization of ARPA was well-known to companies, such as SCT, dealing with HTS technology because it provided substantial funds for research and development to these companies. Tr. 1227:16–24; 1659:15–1661:2. Indeed, SCT had received funding from ARPA in 1993, and viewed it as a significant source of potential funding. Tr. 1735:5–1738:3. Finally, Dr. Yandrofski testified that ARPA had an interest in the development of applications for HTS products, and that he and his company stayed abreast of developments occurring at ARPA. Tr. 1734:14–19; 1738:1–18.

The jury was entitled to infer from all of this evidence, together with the jury's assessment of Dr. Yandrofksi's credibility, that the inventor had knowledge of the report and its materiality to the patentability of his invention. *See Baxter Int'l v. McGaw, Inc.*, 149 F.3d 1321, 1330 (Fed. Cir.1998) (holding that knowledge of materiality, as part of the showing of intent to

deceive, may be inferred "from the sum total of the applicant's conduct"). Indeed, the drawing of such inferences "is peculiarly within the province of the fact finder that observed the witnesses." *Id.* (quotation omitted). As such, the court will adopt the jury's findings in this regard.

### c. Intent

 The plaintiff also maintains that there is insufficient evidence to find that Dr. Yandrofski possessed the requisite level of intent to deceive. "Intent need not be proven by direct evidence; it is most often proven by a showing of acts, the natural consequences of which are presumably intended by the actor. Generally, intent must be inferred from the facts and circumstances surrounding the applicant's conduct." *Molins*, 48 F.3d at 1180–81 (citations omitted). Nonetheless, the circumstantial evidence must prove more than gross negligence; " 'clear and convincing evidence of conduct sufficient to support an inference of culpable intent is required.' " *Id.* at 1181 (quoting *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed.Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 250 (1990)). The conduct must be viewed in light of all the evidence. *Id.* In this case, the jury's instructions correctly reflected these legal principles. *See* Final Jury Instruction No. 7.3.

At trial, Dr. Yandrofski repeatedly denied any knowledge of the ARPA report's materiality or an intent to deceive the PTO. Indeed, he testified that he did not recall receiving or reading the report at all. Tr. 2466:20–2468:6. The defendants, however, presented evidence that Dr. Yandrofski attended a conference, the Cryoelectronics Subdivision meeting of the Electronics Industries Association ("EIA"), at

which the ARPA report was presented by Charles Zuhoski of Booz Allen Hamilton. This evidence included a "sign-in sheet" for the morning session of the EIA meeting on February 7, 1995, at which the ARPA report was presented. DX–1051; Tr. 1829:12–23. This sign-in sheet was signed by the attendees of the meeting as it was passed around the conference table prior to the presentation of the report. Tr. 1829:12–23. Two individuals who attended Mr. Zuhoski's presentation, David Smith and John Terrell, testified that they remember seeing Dr. Yandrofski at the presentation. Tr. 1831:25–1832–11; 1798:14–1799:20. Mr. Smith also testified that he sat next or close to Dr. Yandrofski at the presentation and that he remembers seeing Dr. Yandrofki flipping through a copy of the ARPA report as it was being discussed. Tr. 1830:10–1830:15; 1831:25–1832:24. Indeed, Mr. Smith, a consultant with Booz Allen Hamilton, testified that he paid particularly close attention to Dr. Yandrofski during the presentation because he was concerned about Yandrofksi's reaction since SCT, to which Dr. Yandrofksi served as Chief Executive Officer at that time, was not interviewed by Booz Allen Hamilton during its preparation of the report. Tr. 1832:14–24.

Furthermore, there was evidence that EIA sent letters to all attendees of the February 7, 1995 meeting, including Dr. Yandrofski, providing contact information of the person through whom additional copies of the ARPA report could be obtained. DX–492. The EIA then forwarded a copy of the report to all attendees on April 17, 1995. DX–2159. In addition, the defendants adduced evidence that Dr. Yandrofski and others at SCT[7] prepared a "Market Opportunity" memorandum to potential investors. DX–320. This memo-

---

7. Dr. Yandrofski served as Chief Executive Officer of SCT until April 1997. During that time period, SCT was the assignee of the patent-in-suit. Tr. 248:22–249:5.

randum cites market information which is identical to information contained in the ARPA report, although Dr. Yandrofski testified that the data may have derived from other Booz Allen Hamilton research or another source altogether. Tr. 1774:12–1783:6.

This represents substantial evidence from which the jury could infer that Dr. Yandrofski withheld the ARPA report from the PTO with an intent to deceive. The plaintiff's assertion that there is "no evidence whatsoever" to support such a finding, Pl.'s Open.Brief at 22, is delusive. In support of its position, ISCO cites *Upjohn Co. v. MOVA Pharm. Corp.* for the proposition that an "[i]ntent to deceive cannot be inferred *solely* from the fact that information was not disclosed." *Upjohn*, 225 F.3d 1306, 1312 (Fed.Cir.2000) (emphasis added). The court does not quarrel with this principle. In the case at bar, however, there is substantial evidence from which the jury could infer more than a mere failure to disclose the information. Indeed, it is undisputed that Dr. Yandrofski did not, in fact, submit the ARPA report to the PTO or his patent attorney during the prosecution of the patent-in-suit. The defendants, however, did not rest on that fact. They also presented evidence, as outlined above, that proved or presented a factual framework from which it could be inferred that Dr. Yandrofski attended the presentation of the report; had worked in the past and continued to work with the agency that produced the report; was particularly aware of the report because of its significance to his industry and his company's principal projects; knew of its materiality to the patentability of his claimed invention; and, nonetheless, consciously decided to withhold it from the PTO with an intent to deceive.

In addition, the jury heard the testimony of Dr. Yandrofksi and, presumably, flatly rejected it as incredible. The jury was quintessentially entitled to do just that. *See Molins,* 48 F.3d at 1181 ("The drawing of inferences, particularly in respect of an intent-implicating question . . . is peculiarly within the province of the fact finder that observed the witnesses."). Dr. Yandrofski's demeanor and presumably incredible testimony, added to the substantial circumstantial evidence, caused the jury to find that the defendants had shown clearly and convincingly an intent to deceive. Accordingly, the defendants carried their burden on this issue and as such, the court adopts the jury's findings regarding Dr. Yandrofski's intent to deceive the PTO.

### d. Balancing of Materiality and Intent

■ Having found the requisite materiality and intent, the jury then weighed the degrees of these elements to determine whether, considering all of the circumstances, Dr. Yandrofski's conduct was so culpable as to render the patent unenforceable. The evidence at trial tended to show that the withheld reference was highly material. As such, the degree of intent required for a finding of inequitable conduct is proportionally diminished. *GFI,* 265 F.3d at 1273 ("The more material the omission, the less culpable the intent required, and vice versa.") (quoting *Halliburton Co. v. Schlumberger Tech. Corp.,* 925 F.2d 1435, 1439 (Fed.Cir.1991)). Moreover, there was substantial evidence from which the jury inferred an intent to deceive. Ultimately, the jury concluded that this intent, coupled with the showing of high materiality, sufficed to prove a case of inequitable conduct. Based on the evidence already discussed, the court is satisfied with this conclusion, and will adopt the jury's determination in this regard. Ac-

cordingly, the '215 patent is unenforceable for inequitable conduct.

### 3. Unfair Competition

The jury found that ISCO acted in bad faith and committed unfair competition practices when it made certain communications to competitors and the public regarding its patent rights. The defendants submitted to the jury four separate unfair competition counterclaims. These claims were based on: (1) § 43(a) of the Lanham Act; (2) interference with prospective economic advantage; (3) interference with a contract; and (4) § 17200 of the California Business and Professions Code. Pursuant to a stipulation by the parties, the jury was asked to return a general verdict on unfair competition. Therefore, if substantial evidence supports any one of the four unfair competition theories, the jury's verdict will not be disturbed.

■ To establish a case of unfair competition pursuant to § 43(a) of the Lanham Act, the defendants must show by a preponderance of the evidence that: (1) ISCO made a false or misleading statement of fact in commercial advertising or promotion about the defendants' products; (2) the statement actually deceived or is likely to deceive a substantial segment of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the plaintiff caused the statement to enter interstate commerce; and (5) the statement results in actual or probable injury to the defendants. *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1348 (Fed.Cir.1999). When a Lanham Act claim is asserted against a patent holder for marketplace activity in support of its patent, the claimant also is required to establish that the patent holder acted in bad faith. *Id.* at 1353. Absent bad faith, there can be no violation of the Lanham Act in such a context because a patent holder is entitled to enforce its rights, which include threatening alleged infringers with suit. *Id.* (discussing tension between patent laws and Lanham Act).

■ In the present case, the plaintiff argues that there is no substantial evidence of bad faith. "Exactly what constitutes bad faith remains to be determined on a case by case basis." *Id.* at 1354. Nonetheless, a clear case of bad faith exists when "the patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents to the marketplace that a competitor is infringing the patent." *Id.* By contrast, a patentee does not commit unfair competition when it makes representations that ultimately prove to be inaccurate, provided they make them in good faith. *Golan v. Pingel Enter.*, 310 F.3d 1360, 1371 (Fed.Cir.2002).

At trial, the defendants adduced evidence that George Calhoun, then-Chief Executive Officer ("CEO") of ISCO, received an electronic mail message regarding, among other things, "a Booz Allen Hamilton study on the HTS market," presumably the ARPA report. *See* DX–1735. Thereafter, by September 14, 2001, ISCO sought and received a copy of the report. DX–1310. On September 17, 2001, ISCO issued a press release in which it alleged that the defendants were infringing the '215 patent. DX–1580. On October 3, 2001, the defendants filed amended answers and counterclaims which asserted Dr. Yandrofski's alleged inequitable conduct regarding the ARPA report. D.I. 20, 23. Shortly thereafter, Mr. Calhoun spoke on the telephone with Dr. Yandrofski. Mr. Calhoun "cut off" this conversation when it turned to Dr. Yandrofski's attendance at the meeting where the ARPA report was presented because Mr. Calhoun "wanted [Dr. Yandrofski] to have those conversations, contacts first with my attorney and

not with me." Tr. 2235:21–2237:6. After this date, ISCO made further marketplace assertions of the '215 patent, and filed a lawsuit against another competitor and a customer of Conductus, Dobson Communications. Tr. 1312:8–20.

Based on this evidence, the defendants argue that ISCO acted in bad faith when it made marketplace assertions of infringement "while knowing or remaining deliberately ignorant of" the unenforceability of the '215 patent. Defs.' Answer Brief at 38. This comports with the defendants' assertion of the controlling legal standard: citing *Mikohn*, they assert that "bad faith includes either actual knowledge of the '215 patent's unenforceability, or willful ignorance of the truth." *Id.* at 37. In *Mikohn*, the court stated that a finding of bad faith is not supported when the information communicated by the patentee in the marketplace is objectively accurate:

> Federal precedent is that communication to possible infringers concerning patent rights is not improper if the patent holder has a good faith belief in the accuracy of the communication. Although "bad faith" may encompass subjective as well as objective considerations, and the patent holder's notice is not irrelevant to a determination of bad faith, a competitive commercial purpose is not of itself improper, and bad faith is not supported when the information is objectively accurate. In general, a threshold showing of incorrectness or falsity, or disregard for either, is required in order to find bad faith in the communication of information about the existence or pendency of patent rights. Indeed, a patentee, acting in good faith on its belief as to the nature and scope of its rights, is fully permitted to press those rights "even though he may misconceive what those rights are."

165 F.3d at 897 (quoting *Kaplan v. Helenhart Novelty Corp.*, 182 F.2d 311, 314 (2d Cir.1950)).

The defendants, citing the "disregard" language of *Mikohn*, seem to conclude that "willful ignorance of the truth" is sufficient to support a finding of bad faith. The court is not persuaded that such an interpretation is consistent with the spirit of the cited language, or that it represents the state of the law on this issue. First, it is not necessarily valid to equate "disregard" for a patent's unenforceability with "ignorance" of such unenforceability. More importantly, although *Mikohn* states that falsity of the marketplace communication, or disregard for it, is "required" in the bad faith inquiry, it does not hold that such falsity or disregard, without more, is *sufficient* to sustain a finding of bad faith. Indeed, "[t]he law recognizes a presumption that the assertion of a duly granted patent is made in good faith ... [and] this presumption is overcome only by affirmative evidence of bad faith." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed.Cir.1998) (citing *Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37–38, 33 S.Ct. 202, 57 L.Ed. 393 (1913)).

The defendants have presented no affirmative evidence that George Calhoun or others at ISCO sought, in bad faith, to enforce an unenforceable patent. The mere receipt of the ARPA report and the defendants' counterclaims in which they accused Dr. Yandrofski of inequitable conduct are not sufficient to establish bad faith on ISCO's part in making its marketplace representations. If a pleading alleging inequitable conduct before the PTO were sufficient to impute knowledge of unenforceability and bad faith to the patentee plaintiff, nearly every patent infringement plaintiff would summarily be found liable for unfair competition, as the affirmative defense of inequitable conduct

is routinely asserted. *See Burlington Indus., Inc., v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed.Cir.1988) (describing "the habit of charging inequitable conduct in almost every major patent case" as "an absolute plague"). Unfair competition counterclaims, and in particular ·the element of bad faith, would be stripped of any meaning. Moreover, even a subsequent showing of inequitable conduct, which includes a finding of bad faith in withholding material information from the PTO, is not sufficient to support a finding of bad faith in relation to the allegedly false or misleading marketplace statements. *See, e.g., Pro–Mold v. Great Lakes Plastics*, 75 F.3d 1568, 1575 (Fed.Cir.1996) ("[T]here is no legal basis for a holding that inequitable conduct, or the assertion of a patent procured through inequitable conduct, constitutes unfair competition.... [The Lanham Act] prohibits false designations of origin or false or misleading descriptions of goods or services which are likely to cause confusion. Obtaining a patent through inequitable conduct does not violate this statute.").

The defendants have adduced no affirmative evidence of bad faith. Because all of the unfair competition counterclaims fail without a showing of bad faith,[8] the jury's finding of unfair competition must be overturned. Accordingly, the court need not address the plaintiff's contention that there is no substantial evidence to support an award of unfair competition damages.

### 4. Superfilter III Product

ISCO moves for JMOL that STI's SuperFilter III product infringes the '215 patent. The salient facts relating to the SuperFilter III product are not in dispute. The product is nearly identical to the SuperFilter II product, which admittedly infringes the '215 patent. The relevant difference, however, is that the SuperFilter III product, as offered for sale and sold, includes a connector receptacle on its backplane labeled "27 VDC Out" and an additional cable which connects the "27 VDC Out" connector to a power source. Tr. 1374:16–1375:6; 574:16–586:6. When the cable is removed from the "27 VDC Out" connector and inserted into a separate receptacle called the "AUX" receptacle, a bypass circuit such as that required by the '215 patent is effectuated. ISCO argues that the SuperFilter III product, therefore, contains a fully operational automatic bypass and infringes the '215 patent. By contrast, STI argues that, because the bypass is not enabled unless and until it is manually reconfigured by a human operator, the product does not contain a bypass mode as required by the patent claim.

■■■■ Patent infringement occurs when an individual or entity "makes, uses, offers to sell or sells any patented invention" without authority. 35 U.S.C. § 271(a)

---

**8.** This is true for the state tort claims as well. The defendants' state unfair competition counterclaims are based on the same set of relevant conduct as the Lanham Act counterclaim, *i.e.*, ISCO's assertion of its patent rights in press releases and other marketplace representations – conduct in which a patentee normally is entitled to engage pursuant to its federal patent rights. "[U]nder the *Hunter Douglas* analysis, to avoid patent law preemption of such state law tort claims, bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim." *Zenith Elecs. Corp.*, 182 F.3d at 1355 (citing *Hunter Douglas, Inc. v. Harmonic Design*, 153 F.3d 1318, 1336–37 (Fed.Cir. 1998), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed.Cir.), *cert. denied*, 528 U.S. 1019, 120 S.Ct. 527, 145 L.Ed.2d 409 (1999)). As such, and because the court has found that there is no substantial evidence to support a finding of bad faith on the part of ISCO in making marketplace statements regarding its patent, the court need not further address the other unfair competition counterclaims.

(2003). A product is "made" when "the manufacturing process is complete and the product is ready to be placed in inventory or shipped to a customer." Stipulated Final Jury Instruction 4.6.1. A product is "sold" when it is delivered to a customer. *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*, 1994 U.S. Dist. LEXIS 21537, at *18 (D.Del. Nov. 10, 1994) ("For the purposes of Section 271(a), a 'sale' is not complete until the infringing product is actually delivered to a purchaser."). The accused device does not infringe if one or more of the claimed elements in the device is missing or disabled, notwithstanding the possibility that the device could be modified to infringe. "[A] device does not infringe simply because it is possible to alter it in a way that would satisfy all of the limitations of a patent claim." *High Tech Med. Instrumentation v. New Image Indus.*, 49 F.3d 1551, 1555 (Fed.Cir.1995) (citing *Hap Corp. v. Heyman Mfg. Co.*, 311 F.2d 839, 843 (1st Cir.1962), *cert. denied*, 373 U.S. 903, 83 S.Ct. 1290, 10 L.Ed.2d 198 (1963) ("The question is not what [a device] might have been made to do, but what it was intended to do and did do.... That a device could have been made to do something else does not of itself establish infringement.")); *see also Telemac Cellular Corp. v. Topp Telecom*, 247 F.3d 1316, 1330 (Fed.Cir.2001); *Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1291 (Fed.Cir.2000).

 At trial, STI presented evidence that the SuperFilter III product, as sold and offered for sale, did not contain a bypass circuit. For example, testimony revealed that when STI shipped SuperFilter III products to Alltel, the power cable was connected to the "27 VDC Out" socket. Tr. 1362: 7–9. There was also evidence that, following a letter sent by ISCO to Alltel in which ISCO asserted its '215 patent, Alltel requested a reconfiguration of the SuperFilter III product. Tr. 327:3–330:19. STI obliged, reconfiguring the SuperFilter III product so that it lacked a functioning bypass mode of operation. *Id.* The contract between Alltel and STI for those SuperFilter III products was signed after such reconfiguration, and none of the shipped SuperFilter III products contained an effectuated automatic bypass circuits. Tr. 329:18–330:1.

ISCO adduced no contrary evidence at trial. Instead, it merely argued that the SuperFilter III products, as offered for sale and sold, effectively contained a bypass circuit because the products could be easily manipulated to create a functioning bypass circuit. After hearing all of the evidence, however, the jury determined that, because the bypass is not enabled unless and until it is manually reconfigured by a human operator, the product was not "offered for sale" or "sold" with a bypass mode as required by the patent claim. As just outlined, there was sufficient evidence from which the jury could reasonable reach such a conclusion, and such a finding is supported by legal principle. Therefore, the court will not disturb the jury's verdict that the SuperFilter III product does not infringe the '215 patent.

**B. ISCO's Motion for a New Trial**

 Within ten days of entry of judgment, a party may, in addition to renewing a motion for JMOL, move the court for a new trial pursuant to Federal Rule of Civil Procedure 59. The court may grant a new trial pursuant to this Rule "for any of the reasons for which new trials have heretofore been granted in actions of law in the courts of the United States." FED. R. CIV. P. 59(A). A court should grant a new trial in a jury case, however, only if "the verdict was against the weight of the evidence ... [and] a miscarriage of justice would result if the

verdict were to stand." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir.1991). In making this determination, the trial judge should consider the overall setting of the trial, the character of the evidence, and the complexity or simplicity of the legal principles which the jury had to apply to the facts. *Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 89 (3d Cir.), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). The court must abstain from interfering with the verdict, however, unless it is clear that the jury's verdict is seriously erroneous, *id.*, or if the verdict "shocks the conscience." *Williamson v. Conrail*, 926 F.2d 1344, 1353 (3d Cir.1991).

Thus, upon a motion for new trial which contends that the verdict was contrary to the weight of the evidence, the trial court's focus should be to ensure that no miscarriage of justice occurs while simultaneously respecting a plausible jury verdict. *Kerry Coal Co. v. United Mine Workers of America*, 488 F.Supp. 1080 (W.D.Pa.1980), *aff'd*, 637 F.2d 957 (3d Cir.), *cert. denied*, 454 U.S. 823, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981). When a motion for a new trial is based on allegedly improper remarks made by counsel during argument, the court's focus is slightly different. The salient question then is whether the allegedly improper remarks were so prejudicial as to affect the fairness of the trial and thereby cause manifest injustice. *Corbett v. Borandi*, 375 F.2d 265 (3d Cir.1967).

The plaintiff moves for a new trial on both of the above grounds. First, it argues that a new trial is warranted because ISCO was severely prejudiced by "misrepresentations and inflammatory assertions" by counsel for the defendants. Pl.'s Opening Brief at 35. Second, ISCO maintains that a new trial is required to prevent a miscarriage of justice because the jury's verdict is against the clear weight of the evidence. *Id.*

### 1. The Defendants' Summation

The plaintiff argues that, in their closing arguments, counsel for the defendants improperly accused Dr. Yandrofski of being a liar. The comments to which ISCO particularly objects are:

> Dr. Yandrofski sat in the witness box and told you that he didn't know about the existence of the ARPA report until the year 2002. Dr. Yandrofski cannot be believed.... Dr. Yandrofksi's sitting there telling you he didn't know the report existed until 2002 is an insult to your intelligence.... And one of the things that I would suggest to you is that Dr. Yandrofski's denial that he knew anything about the report is intended to deceive you and this Court the same way he intended to deceive the Patent Office.... And what I would suggest to you is that if Dr. Yandrofski were to walk into the courtroom with a wet raincoat and a dripping umbrella, he might sit in the witness box and tell you that it was bright and sunny out. We ask you to draw your own conclusions.... If there is one thing you remember from this closing argument, perhaps it should be the vision of Dr. Yandrofski walking through the doors of the court wearing a wet raincoat.

Tr. 3226:7–10; 3230:11–13; 3231:8–12; 3232:10–14; 3243:8–11.

ISCO argues that such comments by the defendants' counsel inflamed the jury and prejudiced the plaintiff's case to such an extent that a new trial should be granted. An examination of the cases relied upon by the plaintiff in which new trials were granted reveals that the instant case is plainly distinguishable. For example, in *Fineman v. Armstrong World Indus., Inc.*, counsel for the plaintiffs made a myriad of

offensive comments embracing a wide range of inappropriate subject matter:

> [Counsel for the plaintiffs] during the course of his closing arguments in particular, repeatedly testified as to his own truthfulness and trustworthiness, although of course he was not a witness. His testimony on summation included supplying "facts" not in the record about what he knew, didn't know, found out, etc. He also expressed his opinion, on countless occasions, that [the defendant] concealed information and lied during the course of the trial. Furthermore, [counsel] repeatedly referred to a crime and to a conspiracy in which [the defendant] supposedly engaged, despite the fact that this Court directed a verdict in [the defendant's] favor as to plaintiffs' civil conspiracy claims and there are, of course, no criminal claims involved in this civil lawsuit.... Throughout his closing argument, [counsel for the defendant] repeatedly expressed his opinion as to the merits of [the defendant's] case, the credibility of witnesses, and the culpability of [the defendant] even as to claims not legitimately set forth by the plaintiffs. On more than one occasion, this Court admonished [counsel] to refrain from including his personal opinion in his argument; despite such orders, he continued to assert his views with vigor.

*Fineman v. Armstrong World Industries, Inc.*, 774 F.Supp. 266, 270–71 (D.N.J.1991), *aff'd*, 980 F.2d 171 (3d Cir.1992) (footnote and citations omitted).[9]

The court in *Fineman* cited numerous other objectionable remarks by counsel, including "unadorned, disparaging attack upon defense counsel" in which he "continued to refer to defense counsel as liars despite this Court's admonition and cautionary instruction to the jury." *Id.* at 271. Counsel for the plaintiffs also inferred that defense counsel had engaged in sexual misconduct with a witness and counseled her to lie. *Id.* at 271–72. In the end, the court found that the offending counsel's pattern of vituperative and inappropriate comments warranted a new trial because the "inflammatory rhetoric" caused the jury to be led down a path that "fatally diverged from the evidence." *Id.* at 274.

The other cases cited by the plaintiff recount similar stories of repeated and egregious conduct by counsel. For example, in *Draper v. Airco, Inc.*, counsel for the plaintiff breached in several ways the bounds of conduct established by case law and the relevant code of professional responsibility. 580 F.2d 91, 95 (3d Cir.1978).

> Specifically, he committed the following improprieties: (1) he attempted to prej-

---

**9.** ISCO also contends that *Fineman* stands for the proposition that "requiring objections on closing argument would create 'even more prejudice.'" Pl.'s Reply Brief at 5. This is a literal and figurative misstatement of the opinion. In *Fineman*, counsel for the defendant *did* object, several times, to repeated offensive comments by opposing counsel. Even after several admonishments by the court, counsel for the plaintiffs continued to make the similar inappropriate comments to the jury, and counsel for the defendant continued to make "numerous" objections. *Fineman*, 774 F.Supp. at 272. In this context, the court merely ruled that counsel for the defendant need not object to each and every similar comment by opposing counsel: "Requiring defense counsel to object to every single instance in this overladen record in which plaintiffs' counsel acted objectionably would cause considerable prejudice in the eyes of the jury." *Id.*

In the present case, ISCO did not object at all to the defendants' summation as it was presented to the jury. In any case, because the court concludes that the closing arguments of defense counsel were not unduly prejudicial, the court need not determine whether ISCO's failure to timely object to the comments constitutes a waiver of any objection to them.

udice the jurors through repeated inappropriate references to the defendants' wealth; (2) he asserted his personal opinion of the justness of his client's cause; (3) he prejudicially referred to facts not in evidence; and (4) without provocation or basis in fact, he made several prejudicial, vituperative and insulting references to opposing counsel. *Id.* In *Falkowski v. Johnson*, a new trial was granted because counsel for the plaintiff introduced extraneous matter in his closing argument, and "impugned both defendant and defense counsel on irrelevant grounds." 148 F.R.D. 132,. 135 (D.Del. 1993). Moreover, counsel for the plaintiff revealed to the jury through numerous statements that the defendant carried liability insurance. *Id.* at 135–37. The court found that, in a trial concerning only damages, such a disclosure had tainted the jury's award. *Id.*

 Although the cases cited by ISCO do not necessarily establish the threshold level of prejudice or manifest injustice that must be present in order to warrant a new trial, they are nonetheless illustrative. It is undoubtedly true that there are similarities between certain isolated comments of the offending counsel in *Fineman* or *Draper* and certain isolated comments of the defense counsel in the present case. The court must ground its judgment not on isolated comments reviewed out of context, however, but on a comprehensive view of the entire trial. *Falkowski*, 148 F.R.D. at 135 ("[N]ot all improper remarks will engender sufficient prejudice to mandate the granting of a new trial."); *Draper*, 580 F.2d at 97 (examining prejudicial effect of "argument as a whole" and not "individual instances or types of impro-

priety"). Such an examination reveals that the relatively few comments of defense counsel do not rise to the level of prejudice such that the entire thirteen-day trial is tainted. As the court has exhaustively iterated above in the context of the plaintiff's JMOL motion, the jury's verdict was based on substantial evidence. The verdict is not seriously erroneous, and it does not shock the conscience. Although it would have been wiser of counsel for the defendants to have avoided any argument that could even be perceived as inappropriate, the court is convinced that their comments did not create such prejudice that manifest injustice resulted. The plaintiff's motion for a new trial on this basis is denied.

In its reply brief, ISCO also argues that, in their summation, counsel for the defendants misstated the law of unfair competition. The court finds no error in the defendants' statement that unfair competition may be shown if a patentee "knew of or showed disregard for" the patent's unenforceability, yet represented to the marketplace that a competitor was infringing the patent.[10] *See Mikohn Gaming Corp.*, 165 F.3d at 897. In any case, the court will not belabor an argument raised for the first time in a reply brief.

### 2. The Jury's Verdict and the Weight of the Evidence

As discussed above at length, the jury's verdict was supported by substantial evidence except as to the defendants' counterclaim of unfair competition, which verdict has been overturned. As such, regarding the remainder of the jury's verdict, the court cannot conclude that it is against the clear weight of the evidence, that it is

---

**10.** As discussed above in the context of ISCO's renewed JMOL motion, the court finds no error in the cited "knew of or showed disregard for" language. Rather, the

defendants err when they rely upon *Mikohn* to conclude that mere ignorance of the patent's unenforceability, without more, may sustain a finding of bad faith.

clearly erroneous, or that it shocks the conscience. Accordingly, the plaintiff's motion for a new trial on this ground is denied.

### C. Motion to Strike

The defendants move to strike part of ISCO's reply brief in support of its renewed JMOL motion and motion for a new trial, or, in the alternative, for leave to file a surreply. The movants argue that the brief fails to comply with Local Rule 7.1.3(c)(2) because it raised new material which should have been included in the plaintiff's opening brief to afford the defendants a full and fair opportunity to respond. Specifically, ISCO referred in its reply brief to a trial exhibit, PTX–369, which the defendants claim the plaintiff has mischaracterized. Defs.' Motion to Strike (D.I.508) at 2.

The defendants undoubtedly were aware of ISCO's position regarding exhibit PTX–369, as the document was referred to at trial in Dr. Yandrofksi's direct and cross-examinations. Furthermore, there is no reason to doubt the plaintiff's averment that its omission of PTX–369 from a string of citations in its opening brief was inadvertent. In any case, the court has not relied upon PTX–369 in the present opinion. As stated previously, there was sufficient evidence, absent this exhibit, from which the jury reasonably could have reached its verdict. Accordingly, the defendants' motion to strike or for leave to file a surreply is denied as moot.

### D. Motion for Attorneys' Fees

■■■■■ A district court may award attorneys' fees to the prevailing party of a patent infringement suit. 35 U.S.C. § 285 (2003); *see also Interspiro USA, Inc. v. Figgie Int'l, Inc.*, 18 F.3d 927, 933–34 (Fed.Cir.1994) (awarding attorneys' fees in breach of contract action arising under

patent statute). To receive attorneys' fees, however, the party must demonstrate that the case is exceptional and warrants such an award. *Beckman Instr., Inc. v. LKB Produkter AB,* 892 F.2d 1547, 1551 (Fed.Cir.1989). Even in an exceptional case, however, the court is not bound to award attorneys' fees. *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.,* 781 F.2d 198, 201 (Fed.Cir.1986). "Many factors could affect this result[ ] ... such as the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burden of litigation as between winner and loser." *Id.*

■■■■ The defendants urge that an award of attorneys' fees is appropriate in this case because it is "exceptional" as defined by § 285 and relevant caselaw. They argue that the case is exceptional because "the jury's verdict expressly includes findings of *both* inequitable conduct by the inventors and bad faith by ISCO." Defs.' Opening Brief (D.I.470) at 1. In addition, STI and Conductus claim that ISCO's conduct in initiating and litigating this case, as well as Dr. Yandrofski's "dubious" testimony at trial, buttress the conclusion that this case is exceptional. *Id.*

The court is not persuaded that the instant case is exceptional. First, as discussed above, the court determined that the jury's finding that ISCO had acted in bad faith was unfounded. This vitiates the defendants' argument that the presence of *both* inequitable conduct and bad faith render the case exceptional. The court's finding that there is no affirmative evidence of bad faith on the part of ISCO also reflects the weakness of the defendants' counterclaims as well as, perhaps, their judgment in pursuing them. Second, the evidence of inequitable conduct, although sufficient to withstand a post-trial motion for judgment as a matter of law, was not overwhelming.

Reasonable minds could well have differed on the topic. The court is convinced that the evidence of inequitable conduct, although substantial, does not reveal conduct that is so egregious as to render the case exceptional. Third, the instant infringement suit was not so baseless that one could characterize it as improper or an abuse of the judicial process. Indeed, the fact that the case survived an intensive summary judgment process and garnered wildly different expert opinions on each side is indicative of its *prima facie* legal merit. Fourth, the defendants' comments during closing arguments, although not prejudicial enough to have tainted the fairness of the trial, were improper or, at least, indicative of poor judgment. For all of these reasons, the court finds that the instant case is not "exceptional" and that, therefore, an award of attorneys' fees is not appropriate. The defendants' motion is denied.

## III. CONCLUSION

For the aforementioned reasons, the court will not disturb the jury's finding that the '215 patent is invalid for obviousness. Furthermore, the court treats as advisory, and adopts, the jury's finding that the patentee committed inequitable conduct, rendering the '215 patent unenforceable. Because the jury's verdict that the plaintiff committed unfair competition, however, is not supported by substantial evidence, it will be overturned in that regard. Finally, the present case is not exceptional and does not warrant an award of attorneys' fees.

An order to this effect will issue in conjunction with this opinion.

### ORDER

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:

1. The Plaintiff's Renewed Motion for Judgment as a Matter of Law and for a New Trial Including the Issue of Patent Infringement Damages (D.I.462) is DENIED IN PART and GRANTED IN PART.

2. The defendants' Motion for Attorneys' Fees and Disbursements (D.I. 469) is DENIED.

3. The defendants' Motion for Entry of Judgment on the Issue of Inequitable Conduct (D.I.472) is GRANTED.

4. The plaintiff's Request for Oral Argument on Post–Trial Motions (D.I. 507) is DENIED.

5. The defendants' Motion to Strike, in Part, the Reply Brief of ISCO International, Inc. in Support of its Renewed Motion for Judgment as a Matter of Law and for a New Trial, or in the Alternative to File a Surreply (D.I.508) is DENIED.